PETER STEMKOWSKI, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOHN J. HANNA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4239–75, 3485–76.     Filed February 17, 1981.

*Charles L. Abrahams,* for the petitioners.
*Harry Morton Asch* and *W. Winter Nesbitt III,* for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies and increased deficiencies pursuant to section 6214(a), I.R.C. 1954,[1] in the Federal income tax of petitioners for the taxable year 1971 as follows:

| Docket No. | Income tax deficiency asserted in statutory notice of deficiency | Increase in deficiency pursuant to sec. 6214(a) |
|---|---|---|
| 4239–75 | $5,428.00 | $625.00 |
| 3485–76 | 1,663.08 | 247.32 |

Upon motion of the parties, these cases were consolidated for purposes of trial, briefs, and opinion. In addition, the parties agree that the instant consolidated case will dispose of all the issues in the following cases docketed before this Court:

| Petitioner | Docket No. | Petitioner | Docket No. |
|---|---|---|---|
| Grant Erickson | 4151–75 | Neils Richard Mortenson | 5007–75 |
| Harold E. Snell | 4157–75 | Norman B. Landon | 5008–75 |
| Dale Rolfe | 4161–75 | Norman C. Park | 5009–75 |
| Wayne D. Wood | 4163–75 | Barry Merrill | 5026–75 |
| James Neilson | 4220–75 | Brian J. Gibbons | 5027–75 |
| Wayne Carleton | 4233–75 | Ronald J. Garwasiuk | 5028–75 |
| Eddie Joyal | 4234–75 | Thomas W. Miller | 346–76 |
| Richard T. Duff | 4238–75 | Don McLeod | 2697–76 |
| Robert Birdsell | 4240–75 | Ross Lonsberry | 3461–76 |
| Steven G. Andrascik | 4529–75 | James A. Neilson | 3464–76 |
| Bryan Campbell | 4585–75 | Cameron Fryer | 3465–76 |
| Albert T. DeMarco | 4586–75 | Wayne G. King | 3925–76 |
| John Bond | 4587–75 | Stephen J. Richardson | 3977–76 |
| Alain Pierre Beaule | 4588–75 | Byron D. Baltimore | 4215–76 |
| David Amadio | 4589–75 | John M. Gould | 4216–76 |
| Roger Cote | 4590–75 | Grant Erickson | 4217–76 |
| Garnet E. Bailey | 4591–75 | Robert M. Brown | 4218–76 |
| Dennis Kassian | 4592–75 | Donald T. Caley | 4219–76 |
| Peter LaFramboise | 4593–75 | Adam Keller | 4411–76 |
| Roger DeJordy | 4653–75 | Ronald L. Schock | 4412–76 |
| Camille J. Lapierre | 4994–75 | | |

Petitioners Stemkowski and Hanna are nonresident aliens

---

[1]All section references are to the Internal Revenue Code of 1954, as amended, and all references to the Income Tax Regulations are to the sections in effect for 1971.

whose cases present facts and issues common to the above-listed cases. Accordingly, our decision of the instant "test" case will dispose of those cases.

The issues presented for our decision are:

(1) Whether the stated salaries in the employment contracts, in addition to covering the services of petitioners during the regular season of play, also compensated them for the off-season, the training camp, and the playoffs, so that the time spent by petitioners in Canada during any of these last-mentioned three periods of time causes allocations of salaries to sources outside the United States;

(2) Whether petitioners are entitled to deduct off-season physical conditioning expenses as ordinary and necessary business expenses under section 162;

(3) Whether petitioners are entitled to deduct various expenses incurred in 1971 as "away-from-home" traveling expenses under sections 62 and 162; and

(4) Whether petitioners are entitled to deduct various miscellaneous expenses and, if so, whether they have adequately substantiated such expenses claimed for the taxable year 1971.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Peter Stemkowski, who timely filed his U.S. Nonresident Income Tax Return for the taxable year 1971, resided at Long Beach, N.Y., at the time he filed his petition in the instant case. Stemkowski is a professional hockey player and, in 1970, was employed by the Detroit Red Wings, a professional hockey team associated with the National Hockey League (NHL).[2] His employment contract with Detroit was evidenced by the following 2-year contract (known as a Standard Player's Contract in the NHL) dated October 1, 1970:

NATIONAL HOCKEY LEAGUE

STANDARD PLAYER'S CONTRACT

THIS AGREEMENT   The Detroit Hockey Club, Inc. _____

---

[2]Stemkowski started his professional hockey career with the Toronto Maple Leafs of the NHL and was traded in 1968 to the Detroit team.

hereinafter called the "Club",
a member of the National Hockey League, hereinafter called the "League".

—AND— <u>Peter Stemkowski</u>

hereinafter called the "Player".

of <u>Winnipeg</u> in { Province / State } of <u>Manitoba, Canada</u>

WITNESSETH:

That in consideration of the respective obligations herein and hereby assumed, the parties to this contract severally agree as follows: —

1. The Club hereby employs the Player as a skilled Hockey Player for the term of Two Years commencing October 1st, 1970–71/71–72 and agrees, subject to the terms and conditions hereof, to pay the Player a salary of
<u>Sixty-Six Thousand and Five Hundred Dollars ($66500.00)</u>

*Plus NHL bonuses payable each year as follows:*       *Payable as follows:*
$2500.00 Club finishes in 3rd place or better.       1970–71 Season: $31500.00
$3000.00 Player scores 20 goals during the season.    1971–72 Season: $35000.00
 $100.00 For each additional goal from 21 to 29.
$2500.00 Player scores 30 or more goals during the season.
$2000.00 Team's goals against average is 2.50 or lower upon completion of season.
$1500.00 For each round won in the Play-Offs.

THIS IS A TWO YEAR CONTRACT.

Payment of such salary shall be in consecutive semi-monthly instalments [sic] following the commencement of the regular League Championship Schedule of games or following the date of reporting, whichever is later; provided, however, that if the Player is not in the employ of the Club for the whole period of the Club's games in the National Hockey League Championship Schedule, then he shall receive only part of the salary in the ratio of the number of days of actual employment to the number of days of the League Championship Schedule of games.

And it is further mutually agreed that if the Contract and rights to the services of the Player are assigned, exchanged, loaned or otherwise transferred to a Club in another League, the Player shall only be paid at the rate of
_____Dollars in the _____ League.
or _____Dollars in the _____ League,
or _____Dollars in the _____ League.

2. The Player agrees to give his services and to play hockey in all League Championship, Exhibition, Play-Off and Stanley Cup games to the best of his ability under the direction and control of the Club for the said season in accordance with the provisions hereof.

The Player further agrees,

      (a) to report to the Club training camp at the time and place fixed by the Club, in good physical condition,

      (b) to keep himself in good physical condition at all times during the season,

      (c) to give his best services and loyalty to the Club and to play hockey

only for the Club unless his contract is released, assigned, exchanged or loaned by the Club,

(d) to co-operate with the Club and participate in any and all promotional activities of the Club and the League which will in the opinion of the Club promote the welfare of the Club or professional hockey generally,

(e) to conduct himself on and off the rink according to the highest standards of honesty, morality, fair play and sportsmanship, and to refrain from conduct detrimental to the best interests of the Club, the League or professional hockey generally.

The Club agrees that in exhibition games played after the start of the regular schedule (except where the proceeds are to go to charity, or where the player has agreed otherwise) the player shall receive his pro rata share of the gate receipts after deduction of legitimate expenses of such game. This provision re exhibition games is applicable in the National Hockey League only.

3. In order that the Player shall be fit and in proper condition for the performance of his duties as required by this contract the Player agrees to report for practice at such time and place as the Club may designate and participate in such exhibition games as may be arranged by the Club within thirty days prior to the first scheduled Championship game. The Club shall pay the travelling expenses and meals en route from the Player's home to the Club's training camp. In the event of failure of the player to so report and participate in exhibition games a fine not exceeding Five Hundred Dollars may be imposed by the Club and be deducted from the compensation stipulated herein. At the conclusion of the season the Club shall provide transportation direct to the Player's home.

4. The Club may from time to time during the continuance of this contract establish rules governing the conduct and conditioning of the Player, and such rules shall form part of this contract as fully as if herein written. For violation of any such rules or for any conduct impairing the thorough and faithful discharge of the duties incumbent upon the Player, the Club may impose a reasonable fine upon the Player and deduct the amount thereof from any money due or to become due to the Player. The Club may also suspend the Player for violation of any such rules. When the Player is fined or suspended he shall be given notice in writing stating the amount of the fine and/or the duration of the suspension and the reason therefor.

5. Should the Player be disabled or unable to perform his duties under this contract he shall submit himself for medical examination and treatment by a physician selected by the Club, and such examination and treatment, when made at the request of the Club, shall be at its expense unless made necessary by some act or conduct of the Player contrary to the terms and provisions of this contract or the rules established under Section 4.

If the Player, in the sole judgment of the Club's physician, is disabled or is not in good physical condition at the commencement of the season or at any subsequent time during the season (unless such condition is the direct result of playing hockey for the Club) so as to render him unfit to play skilled hockey, then it is mutually agreed that the Club shall have the right to suspend the

Player for such period of disability or unfitness, and no compensation shall be payable for that period under this contract.

If the Player is injured as the result of playing hockey for the Club, the Club will pay the Player's reasonable hospitalization until discharged from the hospital, and his medical expenses and doctor's bills, provided that the hospital and doctor are selected by the Club and provided further that the Club's obligation to pay such expenses shall terminate at a period not more than six months after the injury.

It is also agreed that if the Player's injuries resulting directly from playing for the Club render him, in the sole judgment of the Club's physician, unfit to play skilled hockey for the balance of the season or any part thereof, then during such time the Player is so unfit, but in no event beyond the end of the current season, the Club shall pay the Player the compensation herein provided for and the Player releases the Club from any and every additional obligation, liability, claim or demand whatsoever. However if upon joint consultation between the Player, the Club's physician and the Club General Manager, they are unable to agree as to the physical fitness of the Player to return to play, the Player agrees to submit himself for examination by an independent medical specialist and the Parties hereto agree to be bound by his decision. If the Player is declared to be unfit for play he shall continue to receive the full benefits of this Agreement. If the Player is declared to be physically able to play and refuses to do so he shall be liable to immediate suspension without pay.

6. The Player represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages. The Player therefore agrees that the Club shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunction proceedings from playing hockey for any other team and/or for any breach of any of the other provisions of this contract.

7. The Player and the Club recognize and agree that the Player's participation in other sports may impair or destroy his ability and skill as a hockey player. Accordingly the Player agrees that he will not during the period of this Contract and of the option of renewal thereof engage or participate in football, baseball, softball, hockey, lacrosse, boxing, wrestling, or other athletic sport without the written consent of the Club.

8. (a) The Player hereby irrevocably grants to the Club during the period of this Contract and of the option of renewal thereof the exclusive right to permit or authorize any person, firm or corporation to take and make use of any still photograph, motion pictures or television of himself, and agrees that all rights in such pictures and television shall belong to the Club exclusively and may be used, reproduced, distributed or otherwise disseminated by the Club directly or indirectly in any manner it desires.

(b) The Player further agrees that during the period of this Contract and of the option of renewal thereof he will not make public appearances, participate in radio or television programs, or permit his picture to be taken, or write or sponsor newspaper or magazine articles, or sponsor commercial products without the written consent of the Club which consent shall not be withheld unreasonably. Where the Club grants its written consent to any of the

activities recited in this sub-section the Player shall receive his proper share of the proceeds of such activities.

9. It is mutually agreed that the Club will not pay, and the Player will not accept from any person, any bonus or anything of value for winning any particular game or series of games except as authorized by the League By-Laws.

10. The Player agrees that during the currency of this agreement he will not tamper with or enter into negotiations with any player under contract or reservation to any Club of the League for or regarding such player's current or future services, without the written consent of the Club with which such player is connected under penalty of a fine to be imposed by the President of the League.

11. It is mutually agreed that the Club shall have the right to sell, assign, exchange and transfer this contract, and to loan the Player's services to any other professional hockey club, and the Player agrees to accept and be bound by such sale, exchange, assignment, transfer or loan, and will faithfully perform and carry out this contract with the same purpose and effect as if it had been entered into by the Player and such other Club.

It is further mutually agreed that in the event that this contract is assigned, or the Player's services are loaned, to anothr Club, the Club shall, by notice in writing delivered personally to the Player or by mail to the address set out below his signature hereto advise the Player of the name and address of the Club to which he has been assigned or loaned, and specifying the time and place of reporting to such club. If the Player fails to report to such other Club he may be suspended by such other Club and no salary shall be payable to him during the period of such suspension.

The Club shall pay the actual moving expenses incurred by a player during the playing season when such move is directed by the Club and is not part of disciplinary action.

12. If the Club shall default in the payments to the Player provided for in Section 1 hereof or shall fail to perform any other obligation agreed to be performed by the Club hereunder, the Player may, by notice in writing to the Club, specify the nature of the default, and if the Club shall fail to remedy the default within fifteen (15) days from receipt of such notice, this contract shall be terminated, and upon the date of such termination all obligations of both parties shall cease, except the obligation of the Club to pay the Player's compensation to that date.

13. The Club may terminate this contract upon written notice to the Player (but only after obtaining waivers from all other League clubs) if the player shall at any time:

    (a) fail, refuse or neglect to obey the Club's rules governing training and conduct of players,

    (b) fail, refuse or neglect to render his services hereunder or in any other manner materially breach this contract,

    (c) fail, in the opinion of the Club's management, to exhibit sufficient skill or competitive ability to warrant further employment as a member of the Club's team.

In the event of termination under sub-section (a) or (b) the Player shall only be entitled to compensation due to him to the date such notice is delivered to

him or the date of the mailing of such notice to his address as set out below his signature hereto.

In the event of termination under sub-section (c) it shall take effect fourteen days from the date upon which such notice is delivered to the Player, and the Player shall only be entitled to the compensation herein provided to the end of such fourteen-day period.

In the event that this contract is terminated by the Club while the Player is "away" with the Club for the purpose of playing games the instalment [sic] then falling due shall be paid on the first week-day after the return "home" of the Club.

14. The Player further agrees that the Club may carry out and put into effect any order or ruling of the League or its President for his suspension or expulsion and that in the event of suspension his salary shall cease for the duration thereof and that in the event of expulsion this contract, at the option of the Club, shall terminate forthwith.

15. The Player further agrees that in the event of his suspension pursuant to any of the provisions of this contract, there shall be deducted from the salary stipulated in Section 1 hereof an amount equal to the exact proportion of such salary as the number of days' suspension bears to the total number of days of the League Championship Schedule of games.

16. If because of any condition arising from a state of war or other cause beyond the control of the League or of the Club, it shall be deemed advisable by the League or the Club to suspend or cease or reduce operations, then:

    (a) in the event of suspension of operations, the Player shall be entitled only to the proportion of salary due at the date of suspension,

    (b) in the event of cessation of operations, the salary stipulated in Section 1 hereof shall be automatically cancelled on the date of cessation, and

    (c) in the event of reduction of operations, the salary stipulated in Section 1 hereof shall be replaced by that mutually agreed upon between the Club and the Player.

17. The Club agrees that it will on or before September 1st next following the season covered by this contract tender to the Player personally or by mail directed to the Player at his address set out below his signature hereto a contract upon the same terms as this contract save as to salary.

The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement.

18. The Club and the Player severally and mutually promise and agree to be legally bound by the Constitution and By-Laws of the League and by all the terms and provisions thereof, a copy of which shall be open and available for inspection by Club, its directors and officers, and the Player, at the main office of the League and at the main office of the Club.

The Club and the Player further agree that in case of dispute between them, the dispute shall be referred within one year from the date it arose to the President of the League as an arbitrator and his decision shall be accepted as final by both parties.

The Club and the Player further agree that all fines imposed upon the

Player under the Playing Rules, or under the provisions of the League By-Laws, shall be deducted from the salary of the Player and be remitted by the Club to the N.H.L. Players Emergency Fund.

19. The Player agrees that the Club's right to renew this contract as provided in Section 17 and the promise of the Player to play hockey only with the Club, or such other club as provided in Section 2 and Section 11, and the Club's right to take pictures of and to televise the Player as provided in section 8 have all been taken into consideration in determining the salary payable to the Player under Section 1 hereof.

20. It is severally and mutually agree [sic] that the only contracts recognized by the President of the League are the Standard Player's Contracts which have been duly executed and filed in the League's office and approved by him, and that this Agreement contains the entire agreement between the Parties and there are no oral or written inducements, promises or agreements except as contained herein.

IN WITNESS WHEREOF, the parties have signed this 1st day of October A.D. 1970

WITNESSES:

(S) Linda Abel

(S) Ahlege Best

The Detroit Hockey Club, Inc.
*Club*

By Linda G. Abel
*President*

Peter Stemkowski
*Player*

Winnipeg, Manitoba
*Home Address of Player*

In addition to the rights and obligations created between Stemkowski and the Detroit Red Wings by the Standard Player's Contract, additional rights and obligations between the parties were effective throughout the calendar year 1971 (except where an interim effective date is hereafter noted) as provided for in the NHL Owner-Player Council Minutes and Agreements. These include the following: (1) The owners agreed to pay for the 1970–71 season $50,000 of the premiums to provide hospital and major medical coverage for the players and their dependents; (2) the owners agreed to fund a pension plan providing for benefits of $300 to each player for each year of service, payable for life, commencing at the age of 45 and guaranteed for a period of 10 years and, in addition, group life insurance including total and permanent disability and dismemberment coverage to the extent of $50,000; (3) travel expenses to training camp and to home base at end of the season were to be paid by the club; (4) for the 1971–72 season, the owners agreed to pay all protected players who played 50 games or more in the NHL in the previous season $600 in lieu of the payment for exhibition games and

training camp allowances, other than transportation, food ($12 per day), and lodging. Other players were to receive $25 for each exhibition game during which they were in uniform and $25 for each week of training camp; (5) for exhibition games played after opening of the NHL schedule (such as charity games), after the legitimate expenses were deducted, the balance of the gate receipts was to be divided among the players; (6) all necessary medical and hospital expenses were payable by the owners for any player injured in the course of his employment. In addition, such player was to receive, for a period not to exceed 6 months, $100 per week while confined to the hospital under doctor's orders and $100 per week after the close of the season, while incapacitated, if such incapacitation caused termination of revenue from outside employment; (7) if a player were traded during the season, the club was to pay the player's actual moving expenses. If traded in the off-season, the club was also to pay the actual moving expenses if the player had a year-round home in the team city at the time of trade. If traded during the season the player delayed the move, the club was also to be responsible for the actual moving expenses if such move were made within 9 months of the trade and the player reported to the team to which he had been traded; (8) players were prohibited from making endorsements of alcoholic beverages and/or tobacco products; (9) when a player made an endorsement, he was entitled to receive all of the fee and was entitled to mention the name of his club (without using the sweater or club insignia). The proceeds from team endorsements were to be equally divided among the players and the club; (10) if a single player made an endorsement wearing the sweater or club insignia, two-thirds of the fee went to the player and one-third to the club. Endorsement fees were payable to the players at Christmas and at the conclusion of the regular season; (11) the clubs agreed not to unreasonably withhold permission for the players to make individual endorsements; (12) the owners agreed to recommend to television sponsors an appearance fee of $50 for a regular game local television broadcast and a fee of $100 for a regular game national telecast; (13) per diem meal allowances for the 1971–72 season while traveling were set at $16 per day except on game dates when the club provided the meals, in which event the allowance was $8 per day. The per diem allowance was paid in full or 50 percent was paid, depending

upon departure time, and no deduction from the allowance was made if meals were provided on board airplanes. This allocation of per diem was effective June 10, 1971; and (14) each home team was to provide two tickets for each player from a visiting team.

In November 1970, Stemkowski was traded to the New York Rangers of the NHL which had its offices and principal place of doing business in New York City. The Rangers played their home games at Madison Square Garden also located in New York City. Pursuant to the trade, the Rangers assumed the obligations of the contract that Stemkowski had entered into with the Detroit team. Stemkowski continued to play hockey for the Rangers until 1977.

During 1971, Stemkowski received from the Rangers the salary provided by his Standard Player's Contract.

The professional hockey season in the NHL consists of four distinct periods: (1) Training camp and exhibition games which begin in September and last approximately 30 days; (2) the regular season of games which begins in October and lasts until April of the following year; (3) the playoff competition which ends in May and ultimately determines the champion of the NHL and winner of the Stanley Cup; and (4) the off-season which begins at the close of the season of competitive play and ends with the first day of training camp. If a hockey team of the NHL does not qualify to participate in the playoff competition, the off-season commences in early April. However, if a team qualifies for the playoffs, the off-season could commence as late as June, depending upon how successful the particular team was in the playoff competition.

Training camp consists of vigorous activities which include both exercise and the actual playing of the game of hockey, with an emphasis on the latter. It is a time when the respective teams select their players for the regular season and hopefully playoff competition. As a result, many (approximately 50) compete for a limited number of positions (20 or 21 players make up a team), which heightens the intensity of training camp and places a premium on being in good physical condition during this period. In addition, the teams participate in exhibition games against one another during training camp. Stemkowski, a citizen of Canada at all pertinent times, lived in Winnipeg, Manitoba,

Canada, and the training camp of the New York Rangers in 1971 was located at Kitchener, Ontario, Canada.

The regular season of an NHL team includes portions of two calendar years: the months of October, November, and December of one year, followed by the months of January, February, and March of the subsequent year. The New York Rangers played regular season games against various members of the NHL in 1971 both in New York City and at the homesites of their NHL opponents. Three of their opponents, the Montreal Canadiens, the Vancouver Canucks, and the Toronto Maple Leafs, were based in Canada. Consequently, the regular season of the Rangers consisted of actual competition between NHL teams; practice sessions; travel to various team cities, including Montreal, Vancouver, and Toronto; promotional events; and offdays. Stemkowski received his total salary during the regular season of play. Prior to his being traded to the Rangers, the Detroit team and he agreed that his salary would be paid in 12 monthly payments. This, however, was not implemented because of his trade to the Rangers.

The total number of days of the regular 1970–71 season for the Rangers was 179 days. This included all days spent both in the United States and Canada participating in games, travel, practice sessions, promotional activities, and offdays. Stemkowski spent 164 days in the United States and 15 days in Canada during this period.

For the Rangers, the regular season ended on April 4, 1971, but the Rangers were eligible to participate in the playoff competition. In the first playoff series, which was held from April 7 through April 15, 1971, the Rangers played the Toronto Maple Leafs. After successfully competing in this series, the Rangers played the Chicago Black Hawks. This series took place from April 18 through May 2, 1971. The total number of days in which the Rangers participated in the playoff series was 28, of which 23 were spent in the United States and 5 in Canada. In addition to payment of his contractual salary, Stemkowski was paid amounts for participating in the playoff series. This amount was determined by calculating the gross receipts generated by the playoff games.

At the conclusion of the playoff series with the Chicago Black Hawks, Stemkowski returned to his home in Canada. From May to September 1971, he remained in Canada where he embarked

upon an off-season conditioning program which included golf, tennis, squash, and basketball, as well as weight lifting, jogging, bicycling, swimming, and bowling. He participated in these activities in order to fulfill the provision in the contract which required him to appear in good physical condition at training camp, and the only way to comply with this requirement was to maintain an off-season conditioning program. He was under no supervision by the hockey club during the off-season. Approximately 5 weeks prior to training camp, Stemkowski received a letter from the Rangers which informed him of the time and place that the training camp for 1971 would commence. The letter also informed Stemkowski of when he could secure his visa for purposes of entering the United States for the upcoming season.

Stemkowski moved to New York following his trade from the Detroit Red Wings. He moved into a house in Long Beach, N.Y., where he shared the payment of rent with other professional hockey players. Stemkowski paid his share of the rent by paying money to one of his roommates who in turn paid a realty company.[3] In addition, Stemkowski paid for all of his meals while in New York as well as laundry expenses.

During the course of the hockey season, Stemkowski incurred expenses for travel by cab from his home in Long Beach to the airports while embarking upon "road trips" to cities of opponent teams in the NHL. He estimated these expenses to be approximately $100 for 1971.

While on road trips, Stemkowski purchased magazines and newspapers at various newstands. He estimated that this expense for 1971 was in the amount of $50 to $60.

Stemkowski also estimated that he spent $500 for tickets to games in which the Rangers were the visiting team. In each such game, two tickets were made available to the members of the visiting team. However, each player was required to purchase the tickets which cost, according to Stemkowski, between $7.50 and $8. Stemkowski purchased tickets for approximately 35 or 40 road games in 1971 which he gave to various individuals.

On occasion, Stemkowski watched other NHL games on television during the course of the season.

---

[3]Stemkowski estimated that the monthly rental payments amounted to between $300 and $400 of which he paid his allocable share.

Stemkowski spent approximately $1,000 in 1971 entertaining individuals who included friends, fans, team members, and newsmen. Stemkowski usually did not socialize with members of the press, but when he did, it was not for the purpose of a personal interview. If the subject of hockey were raised on such occasions, it was done so in a general manner.

During the course of the season, Stemkowski received mail from fans, and he answered their mail by either autographing the card mailed to him or by sending an autographed picture of himself to the fan. He spent between $50 and $60 in 1971 for stamps and envelopes for answering fan mail.

It was the custom of the team members of the Rangers to give Christmas presents to their two trainers in the form of cash. Stemkowski gave approximately $100 to $125 to each trainer in 1971.

Stemkowski paid approximately $100 for haircuts in 1971. Each haircut cost approximately $10 because it involved hair-styling.

During the course of 1971, Stemkowski incurred expenses for telephone calls, most of which represented calls to his mother who resided in Canada.

Stemkowski, on his U.S. Nonresident Alien Income Tax Return (Form 1040 NR) for the taxable year 1971, reported income from wages in the amount of $44,271, from which he excluded $10,625, computed as follows:

| Games played in Canada | Number of days in Canada |
|---|---|
| Vancouver | 3 |
| Vancouver | 3 |
| Montreal | 3 |
| Toronto | 2 |
| Montreal | 2 |
| Toronto | 4 |
| Toronto | 3 |
| Montreal | 3 |
| Toronto | 2 |
| Total | 25 days |

| | |
|---|---|
| Training Camp at Kitchener, Canada | 30 days |

Total days in Canada ................................. <u>55</u>

Total days in Canada
and United States ..................................... 234 = 24%

24% × $44,271 = $10,625

On the same return he claimed, in addition to others, the following deductions:

Travel expenses ............................................... $1,292
Trade journals ..................................................... 75
Promotional expenses, photographs, etc .................... 343
Home telephone and TV business use ...................... 86
State disability insurance ..................................... 74
Sales tax (includes large purchases
and wedding rings) .......................................... 475

He also claimed the following expenditures as deductions with the following explanation:

Employment contract required taxpayer to keep in good physical condition throughout the year; the following expenses were incurred for this business purpose:

Golf shoes .................................................... $60
Golf balls ...................................................... 50
Green fees .................................................... 330
Bowling ........................................................ 30
Sweat suit/apparel .......................................... 10
Running shoes or Adidos [sic] ............................ 15
Swim suit ...................................................... 15
Tennis balls .................................................. 10
Tennis shoes ................................................. 15
Therapeutic treatment ...................................... 25
YMCA membership .......................................... 100
Golf clubs ..................................................... 90
Tennis racquet ................................................ 4
Trainers' fees ................................................. 20

Stemkowski claimed an overpayment on his income tax return for the taxable year 1971 in the amount of $1,376 which was not refunded prior to the mailing of the statutory notice of deficiency.

The Commissioner, in his statutory notice of deficiency mailed to Stemkowski on February 10, 1975, determined (1) that Stemkowski's income from sources within the United States was $38,950 rather than $34,530 as reported on the return; (2) that his claimed travel expenses of $1,292 were not allowable because it was not established that they were ordinary and necessary business expenses, that they were connected with income

effectively connected with the conduct of a trade or business within the United States, and because they were not substantiated in accordance with section 274 of the Code; (3) that the deductions claimed for sales tax, trade journals, promotion expenses, television and telephone, golf shoes, golf clubs, golf balls, green fees, trainer fees, sweat suits/apparel, running shoes or Adidas, therapeutic treatments, bowling, swim suit, tennis balls, tennis shoes, tennis racquet, and YMCA membership were not allowable because it was not established that such expenses were ordinary and necessary business expenses, connected with income which was effectively connected with the conduct of a trade or business within the United States, or expended for the purpose designated; and (4) that the deduction claimed for State disability insurance was not allowable because it was not established that such amount was expended for the purpose designated.

In his petition filed herein, Stemkowski claims that he should be permitted to exclude from income $22,439 as the foreign income portion of his wages. In addition, he claimed the following deductions in addition to those claimed on his 1971 income tax return:

Team city expenses .....................................$4,824
Travel between jobsites ................................... 425
Taxicab fares ............................................. 192

The respondent was granted leave to file an amendment to his answer praying for an increased deficiency on the grounds that the correct exclusion from U.S.-source income is $4,184 and by reason of other adjustments, Stemkowski's income for 1971 was understated by $1,137, resulting in a deficiency of $6,053 instead of $5,428 as determined in the statutory notice of deficiency.

At the trial, we granted Stemkowski's oral motion to file an amended petition to conform the pleadings to the proof, which he did. In his "First Amended Petition" he increased his claim for team city expenses from $4,824 to $6,525; he increased his claim for miscellaneous deductions from $1,418 to $4,051, by claiming the following:

Entertainment of the mass media,
  team members and fans ..................................... $660
Hockey tickets .................................................. 500
Answering fan mail ............................................. 60

Hockey News ................................................ $ 60
Newspaper to read hockey news ............................. 30
Long distance calls ........................................ 720
TV and telephone for business reasons ..................... 86
Trainers' tips ............................................ 250
Hairstyling for image ..................................... 90
Golf shoes ................................................ 60
Golf balls ................................................ 60
Green fees ................................................ 384
Bowling ................................................... 40
Bowling shoes ............................................. 8
Sweat suit ................................................ 20
Adidas .................................................... 15
Therapeutic treatment ..................................... 100
YMCA membership dues ...................................... 155
Canoe Club (health club) dues ............................. 100
Depreciation of golf clubs ................................ 141
Sales tax ................................................. 475
Swim suit ................................................. 13
Tennis balls .............................................. 20
Depreciation of tennis racquet ............................ 4

In his "First Amended Petition," he also increased his claim for travel expenses in excess of reimbursements from $1,292 to $5,813, which included meals, tips, laundry, and taxicabs, and he increased his claim for taxicab fares from $192 to $552.

John Hanna, who timely filed his U.S. Individual Income Tax Return for the taxable year 1971, resided at Virginia Beach, Va., at the time he filed his petition in this proceeding. At all relevant times in the instant case, Hanna was a nonresident alien and a citizen of Canada.

Mr. Hanna was born in Sydney, Nova Scotia, Canada, and is a professional hockey player. He began his professional career with the Montreal Canadiens of the National Hockey League. In 1971, Hanna was under contract with the Seattle Totems, a professional hockey team affiliated with the Western Hockey League (WHL).[4] The Totems' principal place of business and site for home games was Seattle, Wash. All of the teams participating in the WHL were based in the United States in 1971. Consequently, no official games were played in Canada.

---

[4] Petitioner Hanna first began playing for the Seattle Totems in the season of 1968 and 1969. He remained with Seattle up to and including the taxable year in issue.

The hockey season for the WHL is very similar to the season of the NHL as previously discussed. It is divided into four parts: the first part is training camp, which lasts for 30 days and begins in September. During this time, the prospective players are required to appear and participate in the camp which includes the playing of exhibition games with other teams of the WHL. Those participating in training camp are provided lodging and a per diem for meals ($10 per day for meals and $1 per day for incidentals) as well as transportation expenses from their homes to the campsite. In September 1971, Hanna lived in Sydney and traveled to Banff, Alberta, Canada, for the purpose of participating in training camp. At the conclusion of training camp, a team is selected, and for those who are not citizens of the United States, necessary visas are obtained in order that they can gain entry into the United States. Hanna received his visa (designated as "H–2 visa") and moved to Seattle in October 1971, along with his wife and three children, to begin the regular season of play officially sanctioned by the WHL. The regular season began in the second week of October 1971 and concluded in the first week of April 1972.

On October 9, 1970, Hanna entered into the following contract with the Seattle Totems:

WESTERN HOCKEY LEAGUE

THIS AGREEMENT

BETWEEN:   Seattle Totems Hockey Club, Inc.
                      hereinafter called the "Club"
                  a member of the Western Hockey League, hereinafter
                  called the "League."

—AND—                        John Hanna
                      hereinafter called the "Player."
                  of    Sydney    in  { Province / State }  of    Nova Scotia

WITNESSETH:

That in consideration of the respective obligations herein and hereby assumed, the parties to this contract severally agree as follows: —

1. The Club hereby employs the Player as a skilled Hockey Player for the term of one year commencing October 1st, 1970 and agrees, subject to the terms and conditions hereof, to pay the Player a salary of

Sixteen-Thousand Dollars ($16,000.00).

$1,000.00  if team finishes season in 1st Place.       Travel Expenses for wife
   250.00  for each play-off series won.         and family to Seattle
                                         and return.

    50.00  for each shut-out earned during regular
          season play.
  300.00  if goalkeepers end regular season with
          best goals against average.

Same Contract for 1971–72 Season          Club to match League Award

Payment of such salary shall be in consecutive semi-monthly instalments [sic] following the commencement of the regular League Championship Schedule of games or following the date of reporting, whichever is later; provided, however, that if the Player is not in the employ of the Club for the whole period of the Club's games in the Western Hockey League Championship Schedule, then he shall receive only part of the salary in the ratio of the number of days of actual employment to the number of days of the League Championship Schedule of games.

    And it is further mutually agreed that if the Contract and rights to the services of the Player are assigned, exchanged, loaned or otherwise transferred to a Club in another League, the Player shall only be paid at the rate of ___All minor leagues same as above.___Dollars in the _____ League.
or _____Dollars in the _____ League,
or _____Dollars in the _____ League.
2. The Player agrees to give his services and to play hockey in all League Championship, Exhibition, Play-Off and Cup games to the best of his ability under the direction and control of the Club for the said season in accordance with the provisions hereof. The Player further agrees:

    (a) to report to the Club training camp at the time and place fixed by the Club, in good physical condition,
    (b) to keep himself in good physical condition at all times during the season,
    (c) to give his best services and loyalty to the Club and to play hockey only for the Club unless his contract is released, assigned, exchanged or loaned by the Club,
    (d) to co-operate with the Club and participate in any and all promotional activities of the Club and the League, which will in the opinion of the Club, promote the welfare of the Club or professional hockey generally. The player will be compensated for all approved out-of-pocket expenses in participating in all promotional activities, and should be entitled to all fees voluntarily paid to the player for such promotional activities.
    (e) to conduct himself on and off the rink according to the highest standards of honesty, morality, fair play and sportsmanship, and to refrain from conduct detrimental to the best interests of the Club, the League or professional hockey generally.
    The Club reserves the right to limit player's fees and earnings from promotional activities and other sources during the playing season, and to eliminate the receipt of such fees or earnings, if in the Club's judgment, the activity by the player is detrimental to the best interests of the Western Hockey League, its member clubs and hockey.
3. In order that the Player shall be fit and in proper condition for the

performance of his duties as required by this contract the Player agrees to report for practice at such time and place as the Club may designate and participate in such exhibition games as may be arranged by the Club within thirty days prior to the first scheduled Championship game. The Club shall pay the travelling expenses and meals en route from the Player's home to the Club's training camp. In the event of failure of the player to so report and participate in exhibition games a fine not exceeding Five Hundred Dollars may be imposed by the Club and be deducted from the compensation stipulated herein. Club will pay coach class return transportation to place of players domicile.

4. The Club may from time to time during the continuance of this contract establish rules governing the conduct and conditioning of the Player, and such rules shall form part of this contract as fully as if herein written. For violation of any of such rules or for any conduct impairing the thorough and faithful discharge of the duties incumbent upon the Player, the Club may impose a reasonable fine upon the Player and deduct the amount thereof from any money due or to become due to the Player. The Club may also suspend the Player for violation of any such rules. When the Player is fined or suspended he shall be given notice in writing stating the amount of the fine and/or the duration of the suspension and the reason therefor. Copy of this notice to be effective, must be filed with the league office within 48 hours of the effective time of the suspension or fine.

5. Should the Player be disabled or unable to perform his duties under this contract he shall submit himself for medical examination and treatment by a physician selected by the Club, and such examination and treatment, when made at the request of the Club, shall be at its expense unless made necessary by some act or conduct of the Player contrary to the terms and provisions of this contract or the rules established under Section 4.

If the Player, in the sole judgment of the Club's physician, is disabled or is not in good physical condition at the commencement of the season or at any subsequent time during the season (unless such condition is the direct result of playing hockey for the Club) so as to render him unfit to play skilled hockey, then it is mutually agreed that the Club shall have the right to suspend the Player for such period of disability or unfitness, and no compensation shall be payable for that period under this contract.

If the Player is injured as the result of playing hockey for the Club, the Club will pay the Player's reasonable hospitalization until discharged from the hospital and his medical expenses and doctor's bills, provided that the hospital and doctor are selected by the Club and provided further that the Club's obligation to pay such expenses shall terminate when the requirement for medical attention terminates or at the end of the current season.

In the event a player is injured as a result of his activities during training camp, either in training or exhibition games, he shall be entitled to the same salary as his last signed contract. It is also agreed that if the Player's injuries resulting directly from playing for the Club render him, in the sole judgment of the Club's physician, unfit to play skilled hockey for the balance of the season or any part thereof, then during such time the Player is so unfit, but in no event beyond the end of the current season, the Club shall pay the Player

the compensation herein provided for and the Player releases the Club from any and every additional obligation, liability, claim or demand whatsoever.

6. The Player represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages. The Player therefore agrees that the Club shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunction proceedings from playing hockey for any other team and/or for any breach of any of the other provisions of this contract during the period of this contract and the option to renew it.

7. The Player promises and agrees that during the term of this contract he will not play hockey or engage in activities related to hockey for any other person, firm, corporation or institution except with the prior written consent of the Club, and that he will not during the term of this contract, engage in any game or exhibition of baseball, basketball, football, softball, hockey, lacrosse, boxing, wrestling, or other athletic sport which endangers his ability to perform his services hereunder, without the prior written consent of the Club.

8. The Player hereby irrevocably grants to the Club during the period of this Contract and of the option of renewal thereof the exclusive right to permit or authorize any person, firm or corporation to take and make use of any still photograph, motion pictures or telecast of himself, and agrees that all rights in such pictures and telecast shall belong to the Club and may be used, reproduced distributed or otherwise disseminated by the Club directly or indirectly in any manner it desires.

The player further agrees that during the period of this Contract and of the option of renewal thereof he will not make public appearances, participate in radio or television programs, or permit his picture to be taken, or write or sponsor newspaper or magazine articles, or sponsor commercial products without the written consent of the Club.

9. It is mutually agreed that the Club will not pay, and the Player will not accept from any person, any bonus or anything of value for winning any particular game or series of games except as authorized by the League By-Laws.

10. The Player agrees that during the currency of this agreement he will not tamper with or enter into negotiations with any player under contract or reservation to any Club of the League for or regarding such player's current or future services, without the written consent of the Club with which such player is connected under penalty of a fine to be imposed by the President of the League.

11. It is mutually agreed that the Club shall have the right to sell, assign, exchange and transfer this contract, and to loan the Player's services to any other professional hockey club, and the Player agrees to accept and be bound by such sale, exchange, assignment, transfer or loan, and will faithfully perform and carry out this contract with the same purpose and effect as if it had been entered into by the Player and such other Club.

It is further mutually agreed that in the event that this contract is assigned, or the Player's services are loaned, to another Club, the Club shall, by notice in writing delivered personally to the Player or by mail to the address set out below his signature hereto advise the Player of the name and address of the

Club to which he has been assigned or loaned, and specifying the time and place of reporting to such club. If the Player fails to report to such other Club he may be suspended by such other Club and no salary shall be payable to him during the period of such suspension.

12. If the Club shall fail to make payments to the Player as provided in Section 1 hereof, or shall fail to perform without justification any other obligation agreed to be performed by the Club hereunder, the Player shall give the Club written notice of its failure and specify the nature thereof, and if the Club shall fail to remedy the merited complaint within fifteen (15) days after receipt of such notice, this contract may be terminated and upon the date of such termination all obligations of both parties shall cease, except the obligation of the Club to pay the Player's compensation to the date of the termination.

13. The Club may terminate this contract upon written notice to the Player (but only after obtaining waivers from all other League clubs) if the player shall at any time:

    (a) fail, refuse or neglect to obey the Club's rules governing training and conduct of players,

    (b) fail, refuse or neglect to render his services hereunder or in any other manner materially breach this contract,

    (c) fail, in the opinion of the Club's management, to exhibit sufficient skill or competitive ability to warrant further employment as a member of the Club's team.

In the event of termination under sub-section (a) or (b) the Player shall only be entitled to compensation due to him to the date such notice is delivered to him or the date of the mailing of such notice to his address as set out below his signature hereto.

In the event of termination under sub-section (c) it shall take effect 7 days from the date upon which such notice is delivered to the Player, and the Player shall only be entitled to the compensation herein provided to the end of such 7 day period.

In the event that this contract is terminated by the Club while the Player is "away" with the Club for the purpose of playing games the instalment [sic] then falling due shall be paid on the first week-day after the return "home" of the Club.

14. The Player further agrees that the Club may carry out and put into effect any order or ruling of the League or its President for his suspension or expulsion and that in the event of suspension his salary shall cease for the duration thereof and that in the event of expulsion this contract, at the option of the Club, shall terminate forthwith.

15. The Player further agrees that in the event of his suspension pursuant to any of the provisions of this contract, there shall be deducted from the salary stipulated in Section 1 hereof an amount equal to the exact proportion of such salary as the number of days suspension bears to the total number of days of the League Championship Schedule of games.

16. If because of any condition arising from a state of war or other cause beyond the control of the League or of the Club, it shall be deemed advisable by the League or the Club to suspend or cease or reduce operations, then:

    (a) in the event of suspension of operations, the Player shall be entitled only to the proportion of salary due at the date of suspension,

    (b) in the event of cessation of operations, the salary stipulated in Section 1 hereof shall be automatically cancelled on the date of cessation, and

    (c) in the event of reduction of operations, the salary stipulated in Section 1 hereof shall be replaced by that mutually agreed upon between the Club and the Player.

17. The Club shall have an option, to be exercised on or before October 1st next following the season covered by this contract, to tender to the player, personally or by mail directed to the player at his address set out below his signature hereto, a contract upon the same terms as this contract save as to salary.

The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by normal agreement. In the event that the Player and the Club do not agree upon the salary to be paid the matter shall be referred to the President of the League, and the parties agree to accept his decision as final.

18. The Club and the Player severally and mutually promise and agree to be legally bound by the Constitution and By-Laws of the League and by all the terms and provisions thereof, that are in full force and effect, as of the date of the signing of this contract, a copy of which shall be open and available for inspection by the Club, its directors and officers, and the Player, at the main office of the League and at the main office of the Club.

In lieu thereof the Club reserves the right to provide all players with a printed handbook containing the provisions of the League's Constitution and By-Laws pertinent to players, their contract, conduct and activity.

The player acknowledges that he has read either the Constitution and By-Laws or the printed handbook and is thoroughly familiar with the provisions thereof and understands their meaning.

The Club and the Player further agree that in case of dispute between them, the dispute shall be referred within one year from the date it arose to the President of the League as arbitrator, and his decision shall be accepted as final, complete, conclusive, binding and unappealable by the Player and by the Club. The Player hereby waives any and all rights of action against the President, the League, the Club, or any of its members or shareholders, and against any officer of the Club or League arising out of or in connection with the determination of the President, except to the extent of the award made by the President to the Player.

19. The Player agrees that the Club's right to renew this contract as provided in Section 17 and the promise of the Player to play hockey only with the Club, or such other club as provided in Section 2 and Section 11, and the Club's right to take pictures of and to televise the Player as provided in Section 8 have all been taken into consideration in determining the salary payable to the Player under Section 1 hereof.

20. Should the Player become a member of the Armed Forces of the United States or Canada or retire from hockey prior to the expiration of this contract or any option contained herein, and subsequently be released from the Armed Forces or return to professional hockey, then and in either event the time elapsed between the Player's induction into the Armed Forces and his

discharge therefrom, or between his retiring from professional hockey and his return thereto, shall be considered as tolled, and the term of this contract shall be considered as extended for a period beginning with the Player's release from the Armed Forces or his return to professional hockey, as the case may be, and ending after a period of time equal to the portion of the term of this contract which was unexpired at the time the Player entered the Armed Forces or retired from professional hockey; and the option contained herein shall be considered as continuously in effect from the date of this contract until the end of such extended term.

21. Player acknowledges the right and power of the President of the Western Hockey League (a) to fine and suspend, (b) to fine and suspend for life indefinitely, and/or (c) to cancel the contract of, any player who accepts a bribe or who agrees to throw or fix a game or who, having knowledge of the same, fails to report an offered bribe or an attempt to throw or fix a game, or who bets on a game, or who is guilty of any conduct detrimental to the welfare of the Western Hockey League or of professional hockey; and the Player hereby releases the President of the Western Hockey League, individually and in his official capacity, and also the Western Hockey League and every club and every officer, director and stockholder of the League and of every club thereof, jointly, and severally, from all claims and demands for damages and every claim and demand whatsoever he may have arising out of or in connection with the decision of said President of the Western Hockey League in any of the aforesaid cases.

22. It is severally and mutually agreed that the only contracts recognized by the President of the League are the Standard Player's Contracts which have been duly executed and filed in the League's office and approved by him, and that this Agreement contains the entire agreement between the Parties and there are no oral or written inducements, promises or agreements except as contained herein.

23. This contract shall be deemed to have been executed in the State or Province wherein the Club is located and shall be interpreted in accordance with and governed by the laws and statutes of that State or Province. If any provision of this contract is contrary to or in violation of any of the laws or statutes of that State or Province, it shall not affect the remaining provisions of this contract, and all such other provisions of this contract shall remain in full force and effect. Any such provisions of such laws or statutes which shall affect this contract and shall be inconsistent with or in conflict with the provisions of this contract, shall be controlling in lieu of such inconsistent or invalid provision of this contract.

24. The Player hereby authorizes and directs the Club to deduct and pay, and the Club hereby agrees to deduct and pay, to the Western Hockey League Pension Society out of the salary stipulated in Section 1 hereof on behalf of the Player the sum of _Five-Hundred ($500.00)_ or such lesser proportion thereof as the number of days' service of the Player with the Club under this contract bears to the number of days of the League Championship Schedule of games, and to obtain from the Western Hockey League Pension Society a proper receipt for such sum in the name of the Player.

In Witness Whereof the parties have signed this _9th_ day of _October_ A. D. _1970_

WITNESSES:                                        Seattle Totems Hockey Club, Inc.
                                                                            *Club*
                                                           By  Murray Costello
                                                                      *President*
                                                              (S)  John Hanna
                                                                         *Player*
                                             134 Union Street   Sydney, Nova Scotia
                                                            *Home Address of Player*
                                                   Birth Date  April 5   1935
                                                              *Month Day Year*
                                                   Birth Place  Sydney, Nova Scotia
                                                           5' 10½" 187    Defense
                                                          *Height Weight Position*

### IMPORTANT NOTICE TO PLAYER

Before signing this contract you should carefully examine it to be sure that all terms and conditions agreed upon have been incorporated herein, and if any has [sic] been omitted, you should insist upon having it [sic] inserted in the contract before you sign.

On October 15, 1971, Hanna and the Seattle Totems executed a contract identical with the contract executed in 1970 except that paragraph 24 of the later agreement contained no amount as Hanna's contribution to the WHL Pension Society.

During the regular season, the Seattle Totems played games against members of the WHL, both in Seattle and the home cities of their opponents. For those games played away from Seattle, the Seattle Totems furnished the following for its team members: transportation from Seattle to the city of the game, lodging, transportation to and from their place of lodging to the arena where the game was played, transportation back to Seattle, and a per diem for meals while away from Seattle.

In addition to the rights and obligations created between Hanna and the Seattle Totems by the standard player's contracts, additional rights and obligations were effective between the parties on October 14, 1971, as provided in the WHL Professional Hockey Players Association Agreement. These included the following: (1) The clubs agreed to contribute to the WHL Pension Society $400 per year per player who contributed a like amount to the society; (2) the clubs agreed to contribute $500 for the 1971–72 season for health and life insurance benefits for each player not otherwise covered by such insurance; (3) the clubs agreed to pay economy airfare from the player's domicile to the playing city for the player, his wife, and

children, and if the travel exceeded 1 day, the clubs agreed to reimburse the player for lodging of $15, plus $3 lodging for each child; (4) the clubs agreed to pay the actual costs of shipping necessary goods up to $35 and to further compensate the players for the actual cost of ground transportation to and from the airport; (5) for auto travel, the clubs agreed to compensate the players at the rate of $0.12 per mile from their domiciles to the playing city and for lodging set forth in (3) above; (6) reimbursement for meals was provided for at the rate of $11 per day, each, for the player and his wife, and $5.50 for each child traveling with the player; (7) the clubs agreed to reimburse the players for rental of an automobile trailer for transporting goods or the actual shipping expenses up to $35; (8) the training camp allowance included $11 per day for meals plus lodging, and miscellaneous expenses of $1 per day; (9) during the regular season and the playoff season for 1971–72, the clubs agreed to reimburse the players for meals away from home during the playing season at the rate of $11 per day; (10) if a player were injured in the course of his employment and unable to perform, he was to receive an indemnity payment of $100 per week if single, $150 per week if married, and if married with children, $150 per week plus $15 for each child, up to a maximum of $200 per week; (11) the playoff pool was increased to $123,000 and was to be allocated among the players by the Professional Hockey Players Association, subject to approval by the WHL board of governors; (12) no payment was to be made to players for participation in the training camp exhibition games, but in exhibition games with NHL clubs, the players were to receive $50 when the game was played in a WHL city; (13) the players agreed to make themselves available for personal appearances and endorsements, and all fees received by the club were to be paid to the players who participated, together with reimbursement for their expenses for travel, lodging, and incidental expenses. For the taxable year 1971, Hanna received $17,300.60 from the Seattle Totems.[5] Hanna received payments from the Totems between January and April, 1971, and September and December, 1972.

From January 1971 until May or June 1971, Hanna resided in

---

[5]This amount included payment under the contracts which were in effect for the 1970–71 and 1971–72 WHL seasons.

Seattle with his wife and three children. Hanna and his family then returned to Canada where he participated in a conditioning program pursuant to the obligations of his contract with Seattle. In addition, Hanna worked at a job which required the loading and unloading of 100-pound bags of feed. He was under no supervision by the hockey club during the off-season. While still in Canada, Hanna received a letter from the Totems setting forth the time and place of training camp. At the conclusion of training camp, Hanna again moved to Seattle where he remained until the close of 1971.

At the conclusion of the regular season, those teams which qualify participate in the playoff series which ultimately determines the champion of the WHL for a particular season. As a result, the off-season does not commence for all players on the same date. Players participating in the playoffs are compensated for such activities, in addition to their regular salaries. The fourth part of the season is the off-season, which entails the return of the players to their homes in Canada. During the off-season, the players participate in off-season conditioning programs which prepare them for the following training camp and the next season of professional hockey.

While Hanna resided in Seattle, he and his family incurred various expenses which included house rental, fuel and electric bills, groceries, cleaning, phone bills, sewing machine repairs, furniture rental, traffic tickets, clothing, haircuts, television repairs, car payments, and interest payments. Hanna incurred additional expenses during the course of the hockey season. He made 30 away-from-home trips to participate in regular season games against Totems' opponents. At many of these games, he purchased tickets which he gave to close friends or relatives. On occasion, he used the tickets for the purpose of watching a preliminary game played prior to the game involving the Totems. Following the away-from-home games, Hanna entertained various friends by purchasing food and drink at a local bar or restaurant. Hanna also purchased various hockey periodicals during the course of the hockey season. In addition, Hanna made a number of long distance phone calls while in cities playing away-from-home games. It was a tradition among team members to make a gift of money to the trainer during the Christmas season and at the close of the working season. Each

player contributed money to a common fund, and Hanna contributed to this endeavor in 1971.

The Seattle Totems filmed all of their games and used the films in their subsequent training sessions during the regular season. While Hanna was not required to watch games on television, he did watch games between members of the National Hockey League on one of his television sets at his home in Seattle.

The season for the Seattle Totems concluded sometime in April 1971, but Hanna did not return to Canada until after May 7, 1971. However, upon his return to Canada, he embarked upon an off-season training program in order that he appear in good physical condition at training camp as required under his contract with the Totems. To this end, he participated in activities which included jogging, tennis, golf, rope jumping, bowling, and calisthenics. In addition, he spent a portion of the off-season loading and unloading bags of feed and teaching at a hockey school for young players. Following this period of off-season conditioning, the training camp began which marked the beginning of the 1971–72 season of the Seattle Totems as they competed for the championship of the WHL. Prior to training camp, usually 1 month to 6 weeks, Hanna would receive a letter from the Totems requesting that he appear at training camp in top physical condition and informing him of the date and location of the training camp which, as previously mentioned, was in Banff, Alberta, Canada in 1971.

Hanna, on his U.S. Individual Income Tax Return (Form 1040) for the taxable year 1971, excluded none of his wages by reason of being earned outside the United States. He claimed, in addition to other deductions, interest expense of $1,337.47, medical expense of $70, sales tax of $291, and a rental loss of $3,541.67.

Hanna filed a claim for refund in which he claimed an overpayment of income tax for the taxable year 1971 in the amount of $1,382.42, in addition to the $1,638.93 refunded pursuant to a claim for refund on the original return.

The Commissioner, in his statutory notice of deficiency mailed to Hanna on January 22, 1976, allowed Hanna an exclusion of $500 from his income for services performed in Canada because he was a nonresident alien, and he disallowed the following deductions:

| | |
|---|---|
| Interest expense | $1,334.47 |
| Medical expense | 70.00 |
| Sales tax | 141.00 |

In addition, he disallowed the rental loss of $3,541.67 claimed by Hanna on the ground that such a loss is not allowable to a nonresident alien.

In his petition filed herein, Hanna claimed an exclusion of wages from U.S. income of $8,304 and the following deductions:

| | |
|---|---|
| Living expenses in Seattle, Wash | $2,884 |
| State disability | 74 |
| Trade publications | 75 |
| Use of home telephone/television (business) | 97 |
| Promotional expenses, photographs, etc | 112 |
| Expenses for keeping in condition: running shoes, sweat suit, golf balls, and equipment | 157 |
| Unreimbursed away-from-home expenses | 2,884 |
| Travel expenses, including mileage and transportation to the airport | 1,745 |

The respondent was granted leave to file an amendment to his answer praying for an increased deficiency on the grounds that in his statutory notice of deficiency he erroneously allowed Hanna to exclude $500 from wages and that, because Hanna is a nonresident alien, he should have disallowed the following deductions claimed by Hanna on his return:

| | |
|---|---|
| Gas tax | $27 |
| Personal property tax | 10 |
| Sales tax | 150 |

At the trial, we granted Hanna's oral motion to file an amended petition to conform the pleadings to the proof, which he did. In his "First Amended Petition," he claimed an exclusion from income of $8,304 and increased his deduction claimed for team city expenses from $2,884 to $6,795.94. The exclusion from gross income was based on the claim that in 1971 he performed services for the Seattle Totems in Canada for 176 days. He also increased his claim for trade publications from $75 to $80, his promotional expenses from $112 to $212, his conditioning expenses from $157 to $1,245.27, and he claimed the following additional expenses:

Hairstyling ............................................... $60.00
Trainers' tips ........................................... 100.00
Entertaining players on other teams,
    coaches, mass media, etc ........................... 100.00
Sewing expenses ....................................... 51.90

He also increased his claim for travel expenses outside the team city from $1,745 to $2,761.80 (consisting of $30 per day for 75 days, taxicab fares of $210, and 2,515 miles at 12 cents between practice sites and job sites), and he included claims for expenses incurred at training camp in excess of reimbursement of $600 and entertainment expenses of $2,400.

William H. McFarland was a professional hockey player for 10 years in the WHL. Following that he was coach and general manager of the Seattle team for 4 years, after which he became a full-time practicing lawyer for 1 year during which time he was the owner of the Seattle club. He was president and legal counsel of the WHL for three seasons, president and general manager of the Seattle team for 2 years, president of the World Hockey Association, and legal counsel for the World Hockey Association. He was the first players' representative in the WHL and, in 1961, represented all of the players in the WHL.

McFarland, as president of the WHL, approved the employment contract of Hanna with the Seattle Totems dated October 15, 1971. The standard player's contracts similar to those executed by Hanna were in effect when McFarland became president of the WHL. McFarland has substantial familiarity with the WHL standard player's contract dating back to 1948.

It is McFarland's opinion that the salary provided Hanna in the standard player's contract was for all of the services covered by the contract. Hanna was a "holdout" in signing his contract for the 1969–70 season, and he failed to report to training camp. A compromise was reached between Hanna, McFarland, and Murray Costello who was president of the Seattle Totems. It was the position of McFarland that Hanna's failure to attend training camp was a breach of contract and his basic salary could be prorated to eliminate that portion of his basic salary allocable to the period of the training camp. McFarland, however, was a "hard-liner" in the deal, and Hanna was neither fined nor was his salary reduced by reason of his failure to attend training camp. The settlement between Hanna and the Seattle Totems was based upon many factors.

McFarland believes that the WHL standard player's contract was changed from a seasonal to an annual contract in order for the clubs to maintain continuity of the contractual relationship between the players and the clubs.

Clarence Sutherland Campbell was president of the NHL from 1946 to 1977. He was thoroughly familiar with the standard hockey player's contract. He believes that the stated salary had no relationship to the training camp, pre-season exhibition games, the playoffs, or promotional activities during the off-season. Instead, he believes that the salary was provided primarily for playing hockey during the regular season and to some extent for the covenants of the player to refrain from certain acts.

George A. Leader was president of the Western Hockey League from its inception in 1951 until 1969. He is familiar with the hockey player's standard contract. While he was president of the WHL, the standard player's contract was changed from a seasonal contract to an annual contract in order that the clubs not be required to offer a new contract to the players until the beginning of the following season.

It is Leader's belief that the salary provided for in the contract covered the regular season of play and the training camp while he was president of the WHL (ending in 1969).

Vincent H. D. Abbey was a part owner of the Seattle Totems commencing in 1958. From 1958 to the present time, Abbey has always been an officer and director of the Totems, and has been chairman of the board of directors at various times. He was also at various times a governor and alternate governor of the WHL. In 1971, Abbey was a director, a vice president and chairman of the board of directors of the Seattle Totems. He is thoroughly familiar with the standard player's contract of the WHL. It is Abbey's belief that the salary paid Hanna under his contract covering 1971 was solely for the regular season of play. The salary did not cover the off-season, the training camp, or the playoffs.

Emile Francis was general manager of the New York Rangers for 14 years and coach for 11 years. In 1971, he was vice president, general manager, and coach of the Rangers. He also had other positions of authority in professional hockey. He is thoroughly familiar with the standard player's contract. It is Francis' belief that the standard contract covers 12 months in

order to have players under contract in the off-season for drafting and trading before the regular season begins, and that an annual contract is necessary in order for the club to have an ongoing property right in the player. It is Mr. Francis' view that the salary stated in Stemkowski's contract with the Rangers was for the regular season of play and none was paid for off-season services, the training camp, and exhibition games.

The primary purpose in changing the hockey player's standard contract from a seasonal contract to a 12-month contract was to provide continuity in the contractual relationship between the hockey player and the club.

## ULTIMATE FINDINGS OF FACT

The requirement in the employment contracts whereby petitioners must report to training camp in good physical condition is a condition of employment, and the athletic activities which petitioners pursue during the off-season do not constitute performance of services under the employment contracts. The entire salaries stated in the employment contracts are paid only for the regular season of play; none are paid for the off-season nor for the training camp nor for the playoff competition.

The "tax homes" of petitioners for purposes of deducting "away-from-home" travel expenses under sections 62 and 162 of the Code are the cities where the hockey clubs which employed them were located.

## OPINION

### A. Allocation of Income

The first issue for our decision is the proper allocation of petitioners' income to sources within and outside the United States. Petitioners were nonresident aliens performing personal services under written employment contracts. The narrow question presented is whether the salaries paid under the employment contracts covered performance of personal services outside the United States so that a portion of each of the salaries is allocable to the time petitioners were outside the United States.

Sections 861(a)(3) and 862(a)(3), respectively, provide that compensation for personal services performed within the United States and outside the United States shall be treated as income

from sources within the United States and sources outside the United States.

Section 1.861–4(b), Income Tax Regs., applicable to the taxable year 1971 (the taxable years of both petitioners before us) provides as follows:

(b) *Amount includible in gross income.* If a specific amount is paid for labor or personal services performed in the United States, that amount (if income from sources within the United States) shall be included in the gross income. If no accurate allocation or segregation of compensation for labor or personal services performed in the United States can be made, or when such labor or service is performed partly within and partly without the United States, the amount to be included in the gross income shall be determined by an apportionment on the time basis; that is, there shall be included in the gross income an amount which bears the same relation to the total compensation as the number of days of performance of the labor or services within the United States bears to the total number of days of performance of labor or services for which the payment is made.

For convenience, the method of allocation of income on a time basis prescribed above in the regulations and which the parties agree is applicable here, will be referred to as the formula, and it may be depicted as follows:

$$\frac{\text{No. of days services performed in U.S.}}{\text{Total number of days for which compensated}} \times \text{Compensation} = \text{Amount included in U.S. income}$$

All of the parties agree to the applicability of the regulations, and their validity is not challenged.

In order to better understand the issue, a description of the various segments of a hockey player's taxable (calendar) year is appropriate.

In January, the hockey teams are engaged in the regular season of play, referred to in the employment contracts as the "league championship schedule of games." If the team plays a game in the regular season in Canada, it is undisputed that the days spent in Canada are excluded from the numerator of the formula prescribed in the regulations set forth above; i.e., the days spent outside the United States playing hockey in the regular season cause a proportionate exclusion from income from sources within the United States.

The regular season ends in April, at which time the playoffs commence. If the team which employs the hockey player is successful enough to qualify for the playoffs, the player may participate in playoff games, some of which may be in Canada.

The next phase is the off-season during which petitioners return to their homes in Canada. During this period, there is no organized activity required or sponsored by the hockey clubs which employ them.

The final phase before the start of the regular season of play in October is the segment devoted to training camp and exhibition games, some of which may be played in Canada.

Both petitioners were employed throughout 1971 under written contracts. Although the contracts were standard player's contracts within the respective National and Western Hockey Leagues, they were not identical. The pertinent contracts are set forth in full above in the findings of fact.

Throughout 1971, Stemkowski was employed by the New York Rangers of the National Hockey League under a written 2-year contract effective October 1, 1970. It provided for an annual salary of $31,500 plus National Hockey League bonuses based upon the place where the club finished in the league, specified levels of performance by Stemkowski, and rounds won in the playoffs. Under its terms, Stemkowski agreed to give his services and play hockey in all league championship, exhibition, playoff, and Stanley Cup games; to report to the training camp in good physical condition; to keep himself in good physical condition during the season; to play hockey only for the Detroit Red Wings unless the contract had been assigned; and to participate in all promotional activities of the club. He agreed to report to practice and to participate in exhibition games for which he would be reimbursed for his meals and travel expenses to the training camp. If he failed to report and participate in exhibition games, he was subject to a fine of $500 to be deducted from the total compensation provided for in the contract. He was also to be reimbursed for his travel expenses to his home at the conclusion of the season. Stemkowski was also subject to fine or suspension for violation of the rules governing conduct and conditioning. If Stemkowski were disabled or not in good physical condition at the commencement of the season or during the season—for any reason other than a direct result of playing hockey—so that he was rendered unfit to play hockey, he was to receive no compensation for that period. Stemkowski further agreed that during the period of the contract he would not, without written consent of the club, engage in football, baseball, hockey, lacrosse, boxing, wrestling, or other athletic sport which

might endanger his ability to perform. The club was given the power to terminate the contract for certain specified reasons, in which event Stemkowski's compensation terminated at different times measured from the date that the notice of termination was delivered or the date the club returned home from an out-of-town engagement.

Hanna's contracts with Seattle were written 1-year contracts providing for a salary of $16,000 plus bonuses payable for the position the team achieved by the end of the regular season, its performance during the regular season and the playoffs, and the status of the goalkeepers at the end of the season. The salary was payable semimonthly, following the commencement of the regular season or the day of reporting, whichever was later. If, however, Hanna were not employed by the club for the whole regular season, he was to be compensated only in the ratio that the number of days of actual employment bore to the number of days in the regular schedule of games. He agreed to play in all league championship games, exhibition games, playoffs, and cup games. He also agreed to report to training camp in good physical condition and to keep in good physical condition throughout the season. Hanna agreed to report to practice, and he was to be compensated for meals and transportation to training camp. His failure to do so was punishable by a fine of $500, deductible from the compensation stated in the contracts. The club also agreed to pay his return to his domicile by coach class. Violation of the club's rules as to conduct and conditioning subjected Hanna to an unspecified fine or suspension. If Hanna became disabled or unable to perform under the terms of the contracts, except as a result of playing hockey for the club, the club could suspend him during which time he would receive no compensation. If Hanna were injured at training camp or in an exhibition game, he was entitled to the salary he was paid under his last contract. If he were otherwise injured playing hockey for the club, he was entitled to the compensation provided for in the contracts. He agreed not to play—without the written consent of the club—baseball, basketball, football, softball, hockey, or lacrosse, or engage in boxing, wrestling, or other athletic sport which would endanger his ability to perform under the contracts. The club was given the power to terminate the contracts for certain specified reasons, in which event Hanna's compensation terminated at different times measured from the date that

the notice of termination was delivered or the date the club returned home from an out-of-town engagement. In the event of suspension, there was to be deducted from Hanna's salary an amount equal to the proportion that the number of days of suspension bore to the number of days of the regular season.

It is the position of petitioners that the salaries provided in the employment contracts covered all of the services performed by them, including the regular season of play; the playoffs, if any; the off-season; and the training camp and exhibition games. Therefore, in the formula, the numerator would not include the days spent in Canada while playing games during the regular season and the playoffs, the entire period of the off-season, and the training camp and exhibition games. The denominator would be 365 (except in leap years).

The respondent's position is that the salaries provided in the employment contracts covered only services performed during the regular season of play; therefore, excluded from the numerator of the formula would be only the time spent in Canada during the regular season of play. The denominator, under respondent's position, would not be 365 days but only the number of days in the regular season of play. In the case of Hanna, this would result in no exclusion from income from sources outside the United States because the Seattle Totems played no games during the regular season in calendar year 1971 outside the United States. Respondent's position is consistent with his Rev. Rul. 76–66, 1976–1 C.B. 189, although the contract provisions recited in the ruling are not identical with those under which petitioners were employed.

Based upon our analysis of the provisions in petitioners' contracts of employment, those recited in the ruling, the services performed by petitioners, and the wealth of testimony adduced at trial from players and officials in professional hockey we conclude that a uniform holding is dictated and the differences in the contracts are not substantial enough to warrant different results.

The parties agree that the days which Stemkowski spent in Canada playing hockey during the regular season are excludable from the numerator of the formula. Hanna did not perform outside the United States during calendar year 1971 during the regular season.

In analyzing the payments for the various categories of

services performed by petitioners as hockey players; i.e., training camp and exhibition games, playoffs, and off-season, we are confronted with deciding issues of fact. *Dillin v. Commissioner*, 56 T.C. 228 (1971).

The evidence available in the record before us from which we are to conclude for what services the salaries were provided consists of the employment contracts, the NHL Owner-Player Council Minutes and Agreements, WHL Professional Hockey Players Association Agreement, and the testimony of petitioners, William H. McFarland, Clarence Sutherland Campbell, George A. Leader, Vincent H. D. Abbey, and Emile Francis. In deciding such a question of fact, we are called upon to weigh the evidence offered by the respective parties, keeping in mind, however, that petitioners bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.[6]

The employment contracts do not contain allocations of salaries between services performed in the United States and those performed in Canada. For this reason, we must resort to allocation on a time basis required by the regulations.

Petitioners' position may be succinctly stated thus: the contracts cover 12 months, specifying all of the services to be performed by the petitioners in any location, and at any period of time, as well as specifying the acts from which petitioners will refrain. Accordingly, argue petitioners, they performed services under the terms of the contract for 12 months and the salaries should be allocated according to where those services were performed.

First, let us examine the employment contracts in more detail. Petitioners correctly point out that the contracts cover 12-month periods for which they are paid specified salaries. With respect to the off-season, there are no specific provisions defining the services to be performed. Only general provisions apply to the timespan of the off-season. Stemkowski's contract provides for the following duties and obligations which apply to the off-season of play as well as to the remainder of the year: to give his best services and loyalty to the club; to cooperate with the club and to participate in any and all promotional activities of the

---

[6]Petitioner does not bear the burden of proof as to allocation of salary to the training camp attended by Hanna. This matter was raised affirmatively by respondent in an amended answer.

club and the league; to conduct himself off the rink according to the highest standards of honesty, morality, fairplay, and sportsmanship and to refrain from conduct detrimental to the best interests of the club, the league, or hockey, generally; to comply with rules which the club may establish for conduct and conditioning; to submit to medical examination if he is disabled or unable to perform his services; to refrain from participating in certain other specified sports without consent of the club; to consent to being photographed or televised for the exclusive use of the club; to refrain from making public radio or television appearances, having his picture made, writing or sponsoring newspaper or magazine articles or commercial products without the written consent of the club; to refrain from tampering with any negotiations for a player's contract. Most importantly of all to Stemkowski's position is that the contract requires him to report to training camp in good physical condition. He argues that he must maintain such a condition during the off-season; therefore, he is performing services during the off-season.

Hanna's contracts likewise contain general provisions which impose duties and obligations upon him during the off-season as well as the remainder of the year. They are not materially different from those in Stemkowski's contract. Like Stemkowski's contract, Hanna's contracts required him to report to training camp in good physical condition. He likewise argued that maintaining such condition during the off-season constituted performing services for which the salary, in part, compensated him.

Hanna's contracts, like Stemkowski's provide that if he fails to report for, and participate in, exhibition games he is subject to a fine of $500.

All three contracts provide that if the players are not in good physical condition at the commencement of the season so as to render them unfit to play hockey, the club has the right to suspend them without pay.

All contracts provide that if the player were not in the employ of the club for the entire regular season, the salary is to be prorated based upon the ratio of the number of days he was so employed to the total number of days in the league championship schedule.

Next, we turn to the testimony offered by the parties, turning first to the testimony of witnesses called by petitioners.

Stemkowski testified that he was told by the team doctor that the best way to lose weight was to jog and he understood that he had to be in good physical condition at the opening of training camp. He regarded the contract as a yearly contract which obligated him to the team during the course of the games and the off-season.

Hanna testified that he was required to exercise during the off-season and was given an off-season program distributed by the NHL. He understood that he was being compensated for services performed at training camp and for participation in off-season activities.

Petitioners offered the testimony of William H. McFarland. He was a professional hockey player for 10 years in the WHL. Following that, he was coach and general manager of the Seattle team for 4 years, after which he became a full-time practicing lawyer for 1 year during which time he was the owner of the Seattle club. He was president and legal counsel of the WHL for three seasons. He was president and general manager of the Seattle team for 2 years, president of the World Hockey Association, and legal counsel for the World Hockey Association. He was the first players' representative in the WHL and, in 1961, represented all of the players in the WHL.

McFarland, as president of the WHL, approved the employment contract of Hanna with the Seattle Totems dated October 15, 1971. The standard player's contracts similar to those executed by Hanna were in effect when McFarland became president of WHL.

McFarland has substantial familiarity with the WHL standard player's contract dating back to 1948. He testified that the salary provided Hanna in the standard player's contract was for all of the services covered by the contract. He recalled that Hanna was a "holdout" in signing his contract for the 1969–70 season and that he failed to report to training camp. A compromise was reached among Hanna, McFarland, and Murray Costello who was president of the Seattle Totems. It was the position of McFarland that Hanna's failure to attend training camp was a breach of contract and that his basic salary could be prorated to eliminate that portion of his basic salary allocable to the period of the training camp. McFarland, however, described himself as a "hard-liner" in resolving the dispute, and Hanna was neither fined nor was his salary reduced by reason of his

failure to attend training camp. The settlement between Hanna and the Seattle Totems was based upon many factors.

McFarland also testified that the WHL standard player's contract was changed from a seasonal to an annual contract in order for the clubs to maintain continuity of the contractual relationship between the players and the clubs.

Respondent argues that the testimony of petitioners as to the meaning of the standard player's contracts is self-serving because they have a financial interest in the outcome of the litigation. Respondent is correct and we cannot, therefore, accord as much weight to their testimony as to that of disinterested witnesses.

Respondent attacks the testimony of witness McFarland, using an argument by which petitioners attack the testimony of respondent's witnesses; i.e., Mr. McFarland was not a party to the contracts. Respondent points out that McFarland was a part owner of the Seattle club and that the contracts were between Hanna and the Seattle club, not Hanna and the owners of the Seattle club. Respondent also points out that Vincent Abbey, also a part owner of the Seattle club, testified contrary to McFarland.

Although it may be somewhat more orderly to address the question of admissibility of the testimony of respondent's witnesses after we describe their background, qualifications, and testimony, we shall cover the question at this point because respondent relies upon petitioners' argument with respect to the testimony of McFarland.

To begin with, during the trial, counsel for the opposing parties never objected to the testimony of the witnesses on such grounds. In addition, counsel cross-examined the witnesses on their testimony about the standard player's contracts. Accordingly, they waived objections to such testimony, and raising objections for the first time on brief is untimely. To hold otherwise would unfairly deprive the offering party the opportunity to prove his contentions through other witnesses who would be competent to testify.

In addition, the parties have stipulated that the instant consolidated case is a test case for other pending cases. All of the cases involve standard player's contracts and it would be unduly restrictive in this consolidated test case to admit only the

testimony of parties who executed the three standard player's contracts involved here.

Petitioners also rely on cases where parties to contracts have attempted to challenge the validity of contracts, vary their terms, or enforce the contracts. That is not involved here. The validity of the standard player's contracts is not questioned. The parties to the standard player's contracts do not challenge the contracts, nor are the parties here attempting to enforce the terms of the contracts. For these reasons, *Smoot v. Commissioner*, 25 B.T.A. 1038 (1932), and the other cases relied upon by petitioners are not applicable. Petitioners seem to lose sight of the purpose for our inquiry into the standard player's contracts. We must discern on a time basis (under the income tax regulations) what activities by petitioners the specified salaries covered. The contracts do not break down the salaries in such a manner; therefore, we conclude that it is appropriate to rely, in part, upon the custom and practice in the field of professional hockey. We, therefore, hold that the testimony of McFarland is admissible.

Respondent offered the testimony of Clarence Sutherland Campbell, George A. Leader, Vincent H. D. Abbey, and Emile Francis.

Mr. Campbell was president of the NHL from 1946 to 1977. He was thoroughly familiar with the standard hockey player's contract. He testified that the salary had no relationship to the training camp, pre-season exhibition games, the playoffs, or promotional activities during the off-season. It was his view that the salary was provided primarily for playing hockey during the regular season and to some extent for the covenants of the player to refrain from certain acts. He testified that pre-season training camp was not covered by the salary provided in the standard player's contract, but was, instead, based upon other considerations, i.e., reimbursement for transportation and lodging, per diem allowance, and per game allowance for exhibition games. The exhibition game payments are provided for by the collective bargaining agreement. Campbell testified, further, that the player is rewarded for participation in the playoffs separately from his basic salary stated in the standard player's contract. The source of funds for payments to the players for participating in the playoffs is a pool composed of contributions

made by the participating clubs. For promotional activities, the player receives a specific, separate fee.

George A. Leader also testified on behalf of respondent. He was president of the Western Hockey League from its inception, in 1951, until 1969. He was familiar with the hockey player's standard contract. While he was president of the WHL, the standard player's contract was changed from a seasonal contract to an annual contract in order that the clubs not be required to offer a new contract to the players until the beginning of the following season.

He testified that the salary provided for in the contract covered the regular season of play and the training camp while he was president of the WHL (ending in 1969).

Respondent's witness, Vincent H. D. Abbey, was a part owner of the Seattle Totems commencing in 1958. From 1958 to the present time, Abbey has always been an officer and director of the Totems, and chairman of the board of directors at various times. He was also, at various times, a governor and alternate governor of the WHL. In 1971, Abbey was a director, a vice president, and chairman of the board of directors of the Seattle Totems. He was thoroughly familiar with the standard player's contract of the WHL. He testified that the salary paid Hanna under his contract covering 1971 was solely for the regular season of play. The salary did not cover the off-season, the training camp, or the playoffs.

Respondent called Emile Francis as his witness. He was general manager of the New York Rangers for 14 years and coach for 11 years. In 1971, he was vice president, general manager, and coach of the Rangers. He also had other positions of authority in professional hockey. He was thoroughly familiar with the standard player's contract. He testified that the standard contract covered 12 months in order to have players under contract in the off-season for drafting and for trading before the beginning of the regular season. The annual contract is necessary in order for the club to have an ongoing property right in the player. It was Mr. Francis' view that the salary stated in Stemkowski's contract with the Rangers was for the regular season of play and none was paid for off-season services, the training camp, and exhibition games.

As indicated above, we held the testimony of Mr. McFarland admissible; for the same reasons, we hold admissible the

testimony of respondent's witnesses, Campbell, Leader, Abbey, and Francis.

After considering all of the evidence before us, we conclude that the stated salaries in the standard player's contracts cover only the services of the players during the regular season of play. The testimony of petitioners' own witness, McFarland, and the testimony of respondent's witnesses, Campbell, Leader, Abbey, and Francis, leave undisputed the fact that the contracts cover 12-month periods in order to maintain a continuous contractual relationship between the club and the player. There is no evidence that the contracts were changed from seasonal to 12-month contracts in order to change the compensation of the players. As to the off-season, the players may be called upon to make personal appearances but they are separately compensated for such appearances on an ad hoc basis. Following the regular season and playoffs and prior to the training camp the players, while bound to report to training camp in good physical condition, were under no direct supervision by the clubs which employed them. The contracts gave the clubs the right to issue conditioning rules. During such period, they were in Canada and were not required to report to the clubs for examination, instructions, or duties of any kind. There is no specific provision in any of the employment contracts setting forth the activities which the players must perform during the off-season.

Players report to training camp in various degrees of physical condition. None of the witnesses could recall any instance whereby a player's contract was terminated because of his physical condition not being "good," except for a serious injury. We look upon the requirement of "good physical condition" at the beginning of training camp as being a condition of employment. Maintaining a condition of employment, however, does not per se, in our view, mandate a holding that every activity in which the employee engages to achieve that condition constitutes performance of services.

Payments for participation in the playoffs are provided for in the contracts separate and apart from the salaries.

Accordingly, we hold that the salaries stated in the employment contracts covered the services of petitioners only during the regular season of play and, therefore, under section 1.861–4(b), Income Tax Regs., only services performed outside the United States during the regular season of play permit attribu-

tion of a portion of the salary to sources not within the United States.

In the case of Stemkowski, under the terms of the NHL Owner-Player Council Minutes, he was paid a flat $600 for attending training camp in the autumn of 1971, in lieu of payments for exhibition games and training camp allowances (other than allowances for transportation, food, and lodging).

Petitioners rely upon *Levy v. Commissioner*, a Memorandum Opinion of this Court dated Dec. 29, 1942. Of course a memorandum opinion does not constitute precedent as is readily apparent due to being factually distinguishable. In that case, we found as a fact that petitioner performed services for his employer in France. We have declined to find in the instant case that petitioners performed services in Canada for which they received salary payments, except when petitioner Stemkowski played games during the regular season in Canada.

Petitioners' reliance upon *Tipton & Kalmbach, Inc. v. United States*, 480 F.2d 1118 (10th Cir. 1973), is also misplaced. In that case, the Government allocated labor costs by a payroll cost method instead of the time basis dictated by section 1.861–4(b), Income Tax Regs. The Court of Appeals held that the payroll cost method was not proper and upheld the validity of the regulations. In the instant case, respondent has relied upon the time basis for allocating the income, and the question of method of allocation is not involved. We have held that petitioners did not receive salaries under the standard player's contracts for services other than those performed during the regular season of play.

Petitioners cite Rev. Rul. 77–167, 1977–1 C.B. 239, in support of their contention that the off-season conditioning is in preparation for playing hockey. A revenue ruling has "no more binding or legal force than the opinion of any other lawyer." *United States v. Bennett*, 186 F.2d 407 (5th Cir. 1951); *Kaiser v. United States*, 262 F.2d 367 (7th Cir. 1958), affd. 363 U.S. 299 (1960). Nevertheless, because it might appear that the Commissioner was unfairly discriminating against one group of taxpayers, we are constrained to make some observations. Rev. Rul. 77–167 holds that preflight preparation for overseas flights by commercial airline pilots should be taken into account in excluding from income the pilots' time spent in overseas flights.

It is pointed out in the ruling that the overseas flight could not be performed unless the preflight services were also performed.

That situation is not analogous. In the instant case, petitioners contend that they must participate in off-season conditioning in order to report to training camp in good physical condition. We have held not only that the salaries did not cover the off-season, but we have also held that the salaries did not cover the training camp. Moreover, the preflight preparations are under the same careful scrutiny and regimen *required* by the employer of the airline pilots, which is not in any sense the case of the off-season conditioning of hockey players. The factual matters are, therefore, totally different as the ruling itself carefully points out.

Petitioners, in contending that the salaries are allocable to the playoffs, rely upon *Cini v. Commissioner*, 67 T.C. 857 (1977). In that case, petitioner-husband was employed by a domestic corporation which had foreign subsidiaries. His services were performed partly within and partly outside the United States. He received a basic salary plus bonuses based upon the profits of the foreign subsidiaries and the parent corporation's export business. The taxpayers there did not contest the Commissioner's allocation of the husband's basic compensation on a time basis. He contended that because the bonuses were based upon the profits of the foreign subsidiaries, and the parent's export business, they were excludable because they represented compensation for services performed outside the United States. We held for respondent on the basis that there was no proof that the bonuses were paid specifically and exclusively for services performed for the foreign subsidiaries and the parent's export business.

In the instant case, allocation of the basic salaries is the issue, not allocation of the playoff bonuses (received only by Stemkowski). As indicated above, we hold that none of the basic salary is allocable to the period of the playoffs. We conclude that *Cini v. Commissioner, supra,* supports our holding that petitioners here have failed to demonstrate that the basic salary was paid for services performed by petitioners other than during the regular season of play.

Petitioners argue that the salaries are allocable to the entire 12-month periods of the contracts because of all the general convenants to which petitioners obligated themselves. Some of these convenants required petitioners to make themselves

available, i.e., for promotional activities. Other covenants prohibited petitioners from taking certain actions: some of the convenants were absolute and other actions were permissible if consent were given by the club.

The parties disagree on the applicable law stemming from *Piedras Negras Broadcasting Co. v. Commissioner*, 43 B.T.A. 297 (1941), affd. 127 F.2d 260 (5th Cir. 1942), and *Korfund Co. v. Commissioner*, 1 T.C. 1180 (1943).

Petitioners, for the first time on reply brief, rely upon *Piedras Negras Broadcasting Co. v. Commissioner, supra,* arguing that the conditioning of hockey players in Canada during the off-season is comparable to the radio station in *Piedras Negras* which was located in Mexico and which broadcast commercial advertising to the United States. The *Piedras Negras* case has nothing to do with the issue presented here. It involved the question of whether the taxpayer was conducting a trade or business in the United States. We carefully pointed out the parameters of the question presented in that case and the resulting court reviewed opinion (43 B.T.A. at 313–314).

No question has been presented in this proceeding as to whether the income may have been partly from sources within the United States and partly from sources without the United States; nor has there been any contention presented as to whether radio broadcasting constitutes "services rendered partly within and partly without the United States," within the language of section 119(e)(1) of the Revenue Act of 1936. Apparently there has been no allocation of income to sources within or without the United States under rules and regulations prescribed by the Commissioner, within the intent of section 119(e) of the Revenue Act of 1936. Since the contention between the parties here is simply whether, as contended by petitioner, the income was from sources without the United States to a nonresident foreign corporation, or, as contended by the respondent, from sources within the United States to a resident foreign corporation, our opinion is devoted only to that question.

In *Korfund Co. v. Commissioner*, 1 T.C. 1180, 1187 (1943), upon which all parties in the instant case rely, we again pointed out that *Piedras Negras* was concerned only with the employment of capital and labor in a foregin country.

In *Korfund*, individuals residing in Germany received payments from the taxpayer for their agreement not to compete with the taxpayer in the United States. They contended that because their negative performance required the continuous exercise of will of individuals located in Germany, the source of income for the promises not to compete was in Germany. We

rejected the taxpayer's theory by holding that the rights of the Germans to do business in this country in competition with the taxpayer were property rights having a situs in the United States. The consideration they received to forego exercising such property rights was in lieu of what they would have earned had they competed in the United States. Accordingly, we held that the source of income was within the United States.

Respondent relies upon *Korfund* to argue that the negative convenants in the employment contracts and other contractual provisions which do not require affirmative action by petitioners do not constitute the performance of personal services under the formula applicable here. Sec. 1.861–4(b), Income Tax Regs.

Petitioners, describing *Korfund* as a "much criticized case," argue that under its rationale, we should apportion the salaries to petitioners during the off-season in Canada. They contend that because petitioners' promises to refrain from certain acts are accompanied by performing personal services to maintain good physical condition, under *Korfund* they should be allowed the exclusion. As we pointed out above, we hold that the activities of petitioners while in Canada during the off-season did not constitute performing personal services but were, instead, designed to maintain a condition of employment, i.e., arriving at training camp in good physical condition.

We conclude, therefore, that respondent is correct in relying on *Korfund*.

We held above that the salaries provided by the employment contracts were for playing hockey during the regular season. It follows that the negative convenants in the employment contracts were designed to further the primary purpose of the contracts, i.e., playing hockey during the regular season of play. Accordingly, the rationale of *Korfund* requires the holding that the negative covenants do not provide a basis for allocating any of the salary income to sources outside the United States (except when games are played in Canada during the regular season).

The parties disagree on the application of *Perkins v. Commissioner*, 40 T.C. 330 (1963), petitioners arguing that the Court did not reaffirm *Korfund*, and respondent contending that it did. We agree with neither petitioners nor respondent. In *Perkins*, the discussion of *Korfund* was dictum as indicated by the case signal "See" which preceded the citation to *Korfund*.

Petitioners quote from a law review article which states that

in *Korfund* we strained to find income from the use of property in the United States, but petitioners fail to point out that the author of the article also stated that *Korfund* offered a workable rule although the author felt the logic left something to be desired. Such comments hardly relegate our opinion in *Korfund* to such an ignominious classification as "much criticized." In addition, the criticism is nothing more than the views of a single attorney which could hardly be classified as authority. None of the parties here point to the opinion of any court which criticized *Korfund* nor have we found any such authority. Because the parties here seem confused about our regard for our holding in *Korfund,* we now dispel that confusion by reaffirming that holding now. We also conclude that it applies here in light of section 1.861–4(b), Income Tax Regs., which refers only to the performance of labor in allocating the income and makes no reference to nonperformance. Our reading of the regulations denies allocating any of the income to negative covenants. We would, therefore, come to the identical conclusion absent our holding in *Korfund.*

To summarize our holding, we conclude that the salaries paid petitioners under the employment contracts are allocable under the provisions of section 1.861–4(b), Income Tax Regs., solely to the regular season of play. The appropriate formula to apply under the regulations is, therefore, one in which the numerator consists of all time spent in the United States during the regular season, and the denominator consists of the total time of the regular season of play. This will result in no exclusion from income for petitioner Hanna because all of the regular season of play of the Seattle Totems occurred in the United States.

## B. Conditioning Expenses

During the off-season, while Stemkowski resided in Canada, he played golf, tennis, squash, and basketball, and he lifted weights, jogged, rode a bicycle, swam, and bowled. He engaged in these activities in order to fulfill the provision in his employment contract which required him to report to training camp in good physical condition. He paid certain expenses in Canada which related to these activities and, as detailed in the findings of fact, claims that all of his expenses relating to his off-season conditioning activities are deductible as ordinary and necessary business expenses under section 162.

During the off-season while Hanna resided in Canada, he worked loading and unloading 100-pound bags of feed. He also loaded and hauled hay, jogged, and played golf. He also participated in running hockey schools for boys.

Petitioners claim these so-called "conditioning expenses" are deductible under section 162 of the Code. Because petitioners are nonresident aliens we must first decide whether such expenses are allocable to income earned in Canada not subject to taxation by the United States or whether such expenses should be applied ratably to petitioners' income, regardless of where it was earned.

Section 871 of the Code establishes the rate of taxation of income of nonresident aliens. The income of a nonresident alien engaged in a trade or business in the United States is taxed at graduated rates to the extent that such income is effectively connected with the conduct of a trade or business within the United States. Sec. 871(b).

The determination as to whether the income of a nonresident alien is effectively connected with the conduct of a trade or business in the United States is made in accordance with section 864(c) of the Code and section 1.864–3 through section 1.864–7, Income Tax Regs. Section 864(c) provides that factors taken into account shall be whether the income is derived from assets used in the conduct of a trade or business or whether the activities of the trade or business were a material factor in producing the income. Section 1.864–4(c)(6)(ii), Income Tax Regs., provides as follows:

> (ii) *Wages, salaries, and pensions.* Wages, salaries, fees, compensations, emoluments, or other remunerations, including bonuses, received by a nonresident alien individual for performing personal services in the United States which, under paragraph (a) of sec. 1.864–2, constitute engaging in a trade or business in the United States, and pensions and retirement pay attributable to such personal services, constitute income which is effectively connected for the taxable year with the conduct of a trade or business in the United States by that individual if he is engaged in a trade or business in the United States at some time during the taxable year in which such income is received.

Section 1.864–2(a), Income Tax Regs., covers the activities of petitioners; petitioners were engaged in a trade or business in the United States during the taxable year 1971 because they do not fall within any of the exceptions. Accordingly, we hold that during regular hockey season in the taxable year 1971, petitioners, while performing services in the United States, were engaged in a trade or business in the United States producing

income which is effectively connected with the conduct of a trade or business in the United States.

Section 872(a)(2) of the Code provides that gross income which is effectively connected with the conduct of a trade or business within the United States is included in the gross income of a nonresident alien, and section 873 allows deductions to a nonresident alien only to the extent that they are connected with income which is effectively connected with the conduct of a trade or business within the United States. Section 873 confers upon the Secretary the authority to prescribe regulations for the apportionment and allocation of the deductions.

Section 1.873–1(a)(1), Income Tax Regs., provides that the proper apportionment and allocation of the deductions shall be determined as provided in section 861 et seq. of the Code.

Petitioners contend that the conditioning expenses were incurred in order to enable petitioners to report to training camp in good physical condition. The emphasis on good physical condition as stated in the briefs filed by the parties pertains to the beginning of training camp, not the regular season of play. The reason for this emphasis is obvious. Training camp is held between the off-season and the regular playing season. Petitioners have demonstrated that at training camp the players and clubs "get their act together." Contracts are signed, games are played, and the players use the training camp to get in shape for the regular hockey season.

The training camps attended by both Stemkowski and Hanna were conducted in Canada. As detailed above, they received per diem, food, and lodging while at training camp. We have held above that no portions of the salaries stated in the employment contracts were allocable to training camp. It is undisputed by the parties that petitioners are taxable in the United States on income they received from performing personal services in the United States. Sec. 861(a)(3); sec. 1.861–4, Income Tax Regs. The income they earned in Canada during the off-season, if any, and that earned at training camp is not taxable in the United States. Sec. 862(a)(3); sec. 1.862–1(a)(1)(iii), Income Tax Regs. *Roerich v. Commissioner*, 38 B.T.A. 567 (1938), affd. 115 F.2d 39 (D.C. Cir. 1940), cert. denied 312 U.S. 700 (1941). The parties do not disagree that the allocation of income between the United States and Canada is properly made on the basis of services performed in each jurisdiction. Sec. 1.861–4(b)(2), Income Tax Regs.

From the items of gross income from sources within the United States, expenses properly apportioned or allocated thereto are deductible unless they cannot definitely be allocated to an item or class of income, in which event a ratable portion is deductible. Sec. 861(b); sec. 1.861–8, Income Tax Regs. In like manner, deductions are not allowed which are properly apportioned or allocated to income from sources not within the United States. Sec. 862(b); sec. 1.862–1(b), Income Tax Regs. The question involved here, therefore, is whether the conditioning expenses incurred by petitioners while residing in Canada during the off-season periods of their contracts should be allocated or apportioned to the income earned in Canada, the income earned in the United States, or to both. Compensation for personal services constitutes one class of income and specific deductions are definitely related to compensation. Sec. 1.861–8(a)(3)(i), Income Tax Regs. Petitioners were employees and their conditioning activities performed in Canada were incurred as a result of or incident to their participation as employees at training camp. Sec. 1.861–8(b)(2), Income Tax Regs. The burden of proof is on petitioners to establish that their deductions were definitely related or proximately connected to United States income to be allowable as deductions. *Grunebaum v. Commissioner*, 50 T.C. 710 (1968), affd. 420 F.2d 332 (2d Cir. 1970), cert. denied 397 U.S. 1075 (1970). See also *F. W. Woolworth Co. v. Commissioner*, 54 T.C. 1233 (1970). It is the relationship of the expenses to the source of income which controls, not where the expenses are incurred.[7] The allocation rules emphasize the factual relationship between the deduction and class of gross income. Sec. 1.861–8(b)(1), Income Tax Regs. The conditioning expenses were incurred by them to enable them to comply with the provisions of their employment contracts which required them to report to training camp in good physical condition. The training camps which both Stemkowski and Hanna attended were located in Canada. Accordingly, we hold that the conditioning expenses incurred by them are allocable to the income they earned in Canada during the training session and are, therefore, not deductible. Such a holding makes it unnecessary for us to decide the abstract question as to whether the conditioning

---

[7] *Dowell v. Commissioner*, T.C. Memo. 1977–101.

expenses incurred by a professional athlete during the off-season of play to aid him in reporting to training camp in good physical condition are deductible.

## C. "Tax Homes" of Petitioners

The next issue for our decision is whether petitioners are entitled to deduct various expenses incurred in 1971 as "away-from-home" traveling expenses under sections 62 and 162. Petitioners maintain that their tax homes in 1971 were Canada. Therefore, their position is that all of their expenses incurred in the United States in 1971 constituted away-from-home expenses. Petitioners further argue that due to the restrictions placed upon them by the visas issued to them, they were only temporarily present in the United States and were prohibited by law from establishing a tax home in the United States. Respondent takes the position that petitioners' tax homes in 1971 were the locations of the employer hockey clubs, i.e., New York, N.Y., and Seattle, Wash., respectively. Therefore, respondent argues that all expenses incurred in such locations are nondeductible personal living expenses.

In order for petitioners to prevail, they must first demonstrate that they have satisfied the three-prong test set forth in *Commissioner v. Flowers*, 326 U.S. 465, 470 (1946), which is:

(1) The expense must be a reasonable and necessary traveling expense, as that term is generally understood. This includes such items as transportation fares and food and lodging expenses incurred while traveling.
(2) The expense must be incurred "while away from home."
(3) The expense must be incurred in pursuit of business. * * *

With regard to the term "home," we have historically followed the criteria set forth in *Flowers*, to the effect that a taxpayer's home for purposes of deducting traveling expenses is the principal place of his employment or business. *Commissioner v. Stidger*, 386 U.S. 287 (1967); *Flowers v. Commissioner, supra* at 473.

The facts presented in the instant case are strikingly similar to those found in *Wills v. Commissioner*, 48 T.C. 308 (1967), affd. 411 F.2d 537 (9th Cir. 1969), a case upon which respondent relies. In *Wills*, the taxpayer was a professional baseball player with the Los Angeles Dodgers and maintained a home in Spokane, Wash., where his wife and children resided. The taxpayer spent a total of 138 days and 96 days, respectively, in Spokane during

the 2 taxable years in issue. The remainder of the time the taxpayer spent in Los Angeles, Calif., playing baseball and preparing a night club act. In *Wills*, we were called upon to decide whether the taxpayer was entitled to deduct all of his expenses incurred while he was in Los Angeles as away-from-home traveling expenses. The threshold question was whether the taxpayer's tax home was Los Angeles or Spokane, and we found that Los Angeles was his tax home. Our finding was based upon the fact that the team stadium where all home games were played (approximately one-half of all games played) was located in Los Angeles. In addition, it was Los Angeles with which the team was identified. Further, we found that the taxpayer's motives for maintaining a home in Spokane were personal rather than business oriented. *Wills v. Commissioner*, *supra* at 312–313.

By comparison, petitioners in the instant case find themselves similarly situated. New York and Seattle were both identified with their respective teams. Approximately one-half of all hockey games were played at the home team locations.[8] In addition, we have held above that their salaries were earned in the United States during the regular season of play. *Montgomery v. Commissioner*, 64 T.C. 175 (1975); *Wills v. Commissioner*, *supra* at 313.

Petitioners further contend that their status as nonresident aliens prevented them from establishing a "tax home" in the United States and in this regard they rely upon Rev. Rul. 73–578, 1973–2 C.B. 39. Their reliance is misplaced. Rev. Rul. 73–578 holds that nonresident aliens who enter the United States, under a visa valid for 6 months, with the intention of resuming their regular employment in their native country, after the 6-month period, do not establish a tax home within the United States and any expenses incurred during such time are deductible as away-from-home expenses. While it must be recognized that a revenue ruling is merely the opinion of respondent, we consider Rev. Rul. 73–578 factually distinguishable from the instant case. Petitioners were employed under a contract with a United States employer and did not intend to return to Canada for the purpose of continuing their preexisting "employment" (the record is

---

[8]Cf. *Gooderham v. Commissioner*, T.C. Memo. 1964–158; *Hall v. Commissioner*, T.C. Memo. 1964–157.

devoid of any evidence of such prior employment in Canada). They were present in the United States in 1971 for a period in excess of 6 months. Moreover, we consider the principles set forth in *Flowers* and *Stidger* to be the guiding factors in determining petitioners' "tax home."

Finally, petitioners argue that they were temporarily away from their homes in Canada in 1971 due to the temporary nature of their employment. They contend that they were subject to being traded to another hockey team at any time and that they had no expectation of employment with the New York Rangers and Seattle Totems on an indefinite basis. The record before us demonstrates that petitioner Hanna had been employed by the Seattle Totems from 1968 until the end of his last contract which was entered into in 1972. With respect to petitioner Stemkowski, his career as a professional hockey player began in 1965 with the Toronto Maple Leafs (a member of the National Hockey League) with whom he played until 1968 when he was traded to the Detroit Red Wings, also a member of the National Hockey League, with whom he remained until November 1970 when he began his career with the New York Rangers. Upon his trade to the New York Rangers, petitioner Stemkowski obtained a 2-year contract with the Rangers. With this employment history, petitioners could reasonably expect recurring seasonal employment of a kind which is indistinguishable from that found in *Dilley v. Commissioner*, 58 T.C. 276 (1972). In that case, Mr. Dilley resided in Arizona, but for 3 consecutive years he spent 5 months per year in Florida where he was employed as a parimutuel manager at a racetrack. We held that, due to Dilley's recurring seasonal employment in Florida, he was not temporarily away from home while employed in Florida, in spite of the fact that he was only informally notified at the end of each 5-month period that he had a job the following year. In the instant case, petitioners were under formal contract with their employers which, in petitioner Stemkowski's case, was a 2-year contract with an option to renew. Petitioner Hanna was under a 1-year contract with an option to renew. Accordingly, we find that petitioners were not temporarily employed by their respective teams in 1971. We recognize that petitioners were subject to being traded at any time during their employment, but as we stated in *Gardin v. Commissioner*, 64 T.C. 1079, 1084 (1975):

Petitioner's [a professional football player] exposure to being traded during his 3-year period of employment does not compel a decision for petitioners. The

potentiality of transfer does not necessarily require that an employment be characterized as "temporary." *Darrell Spear Courtney*, 32 T.C. 334, 343 (1959.) To hold otherwise would cause most players of professional sports to be engaged in a series of temporary employments, so that their living expenses at franchise locations would be deductible. We do not believe that Congress intended section 162(a)(2) to produce such a result. [Fn. refs. omitted.]

We see no reason to deviate from this rationale. Therefore, we find that petitioners' tax homes for their taxable year 1971 were New York, N.Y., and Seattle, Wash., respectively. Therefore, petitioners are not entitled to deduct the living expenses they incurred while residing in their respective team cities in 1971.

## D. Miscellaneous Deductions

The next issue for our decision is whether petitioners are entitled to deduct various miscellaneous expenses, and if so, whether they have adequately substantiated such expenses claimed for the taxable year 1971. The expenses in question include the following items:

| *Petitioner Stemkowski* | *Petitioner Hanna* |
| --- | --- |
| Trade publications | Trade publications |
| Promotions[1] | Promotions[1] |
| Telephone | Telephone |
| Television | Television |
| Disability insurance | Sewing |

[1]This item includes expenses for entertainment, hairstyling, purchase of tickets to hockey games, and, with respect to petitioner Stemkowski, the additional expense of answering mail.

Both parties recognize that for the above items to be deductible, petitioners must demonstrate that their expenses were ordinary and necessary under the provisions of section 162. Section 162 allows a deduction for expenses incurred in carrying on a trade or business and, in the instant case, petitioners' trade or business was that of an employee of their respective hockey teams. *Noland v. Commissioner*, 269 F.2d 108 (4th Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied 361 U.S. 885 (1959). Their duties were specifically set forth in their employment contracts, with the overriding duty being that of playing competitive professional hockey. However, their contracts did not require petitioners to purchase trade publications, maintain a telephone, watch professional hockey games shown

on television, or make gifts to club trainers. Petitioners' contracts did provide that they were required to participate in promotional activities deemed appropriate by their respective teams. In addition, the teams agreed to reimburse petitioners for participating in a designated promotional activity. There is nothing in the record which indicates that expenses for the above-described items, i.e., entertainment, hairstyling, the purchase of hockey tickets for others, and the answering of fan mail, were part of the promotional activities set forth in the employment contracts or actually conducted in 1971. Moreover, the teams made no agreement with petitioners that if they incurred expenses for all of the above items that they would be reimbursed. In addition, petitioners have failed to prove that the respective teams asked petitioners to perform such activities. Finally, there is nothing in the record which would prove that petitioners' employment was dependent upon their incurring expenses for the above items. *Fountain v. Commissioner*, 59 T.C. 696 (1973); *Heidt v. Commissioner*, 274 F.2d 25 (7th Cir. 1959), affg. a Memorandum Opinion of this Court. We recognize that the above items are potentially deductible when considered with the appropriate facts. However, petitioners' reliance upon decisions which allow deductions for similar expenses are inapposite for in each such case, the taxpayer was not acting as an employee. Sec. 62; sec. 1.162–17, Income Tax Regs. Accordingly, petitioners have failed to prove that they are entitled to deduct expenses incurred for trade journals, promotional activities, maintaining a telephone and television, and making gifts to their team trainers.

Petitioner Stemkowski asserts that he is entitled to a deduction for amounts withheld from his salary which were used by the New York Rangers to pay the premiums on disability insurance for him. There is absolutely nothing in the record to prove that such payments constituted a deductible expense. Respondent, in his opening brief, advances several reasons why the deductions are not allowable, citing authority therefor. Petitioners did not respond on reply brief with any authority

but, instead, argued that the amounts were deductible. We agree with respondent.[9] Petitioner Stemkowski has failed in his burden of proof in this regard.

Petitioners further maintain that they are entitled to deductions for the payment of various types of taxes and interest. Specifically, petitioner Stemkowski argues that he is entitled to deduct sales tax he paid when purchasing a wedding ring in 1971. Petitioner Hanna seeks to deduct amounts spent for gasoline tax, personal property tax, sales tax, and interest. Petitioners argue that these costs were incurred while they were in the United States in 1971, at a time when they were performing services as professional hockey players. Therefore, these costs were connected with their trade or business and are thus deductible.

Nonresident aliens are allowed to deduct expenses only to the extent that the expenses are properly allocable to income from sources within the United States and only if such income is subject to the regular tax as provided in section 871(b). Section 873 provides:

(a) GENERAL RULE.—In the case of a nonresident alien individual, the deductions shall be allowed only for purposes of section 871(b) and (except as provided by subsection (b)) only if and to the extent that they are connected with income which is effectively connected with the conduct of a trade or business within the United States; and the proper apportionment and allocation of the deductions for this purpose shall be determined as provided in regulations prescribed by the Secretary.

(b) EXCEPTIONS.—The following deductions shall be allowed whether or not they are connected with income which is effectively connected with the conduct of a trade or business within the United States:

(1) LOSSES.—The deduction, for losses of property not connected with the trade or business if arising from certain casualties or theft, allowed by section 165(c)(3), but only if the loss is of property located within the United States.

(2) CHARITABLE CONTRIBUTIONS.—The deduction for charitable contributions and gifts allowed by section 170.

(3) PERSONAL EXEMPTION.—The deduction for personal exemptions allowed by section 151, except that only one exemption shall be allowed under section 151 unless the taxpayer is a resident of a contiguous country or is a national of the United States.

In the instant case, it is undisputed that the sales tax

---

[9]*Cecere v. Commissioner*, T.C. Memo. 1975–371, affd. in an unpublished opinion (3d Cir., Dec. 7, 1976).

deduction claimed by petitioner Stemkowski related to a personal item, i.e., the purchase of a wedding ring. This clearly would not come under the provisions of section 873(a) or (b) because it was not connected with income which was effectively connected with his playing professional hockey for the New York Rangers within the United States, and it does not come under any exception contained in section 873(b). With respect to petitioner Hanna who claimed deductions for gasoline tax, personal property tax, and sales tax, there is nothing in the record before us which would indicate that these items are deductible under section 873(a), and clearly, they do not come within the exceptions provided in section 873(b). Petitioner Hanna incurred interest expenses in 1971 which related to the purchase of an automobile. There is nothing in the record to show that this expense satisfied section 873(a) or (b). Moreover, even if petitioners could prove that the above-claimed items were deductible under section 873(a), there is nothing in the record which establishes that the expenditures were required by the terms of their employment and that they were not entitled to reimbursement. *Fountain v. Commissioner, supra; Heidt v. Commissioner, supra.*

Petitioners further assert that they are entitled to deduct expenses incurred for traveling in the pursuit of their trade or business while away from their team cities, i.e., Seattle and New York City. These expenses encompass travel to cities when petitioners' respective teams played NHL opponents. Included in their expenses are local travel within these cities, meals, tips, laundry, and "other incidental expenses." For purposes of these items, petitioners also claimed deductions for expenses incurred in travel to and from transportation terminals for away-from-home games. Petitioner Hanna claims an additional amount for travel expenses which relate to training camp.

Petitioners argue that the above expenses constitute amounts which were not reimbursed by their respective teams. Respondent takes the position that these expenses were not ordinary and necessary and, in the alternative, that if they constitute ordinary and necessary expenses, petitioners have failed to substantiate the expenses.

Section 162(a)(2) allows a deduction for away-from-home expenses. It is undisputed that the expenses involved were incurred while petitioners were away from their respective team

cities. However, in order for petitioners to be entitled to a deduction, they must comply with the substantiation requirements set forth in section 274(d), which provides:

(d) SUBSTANTIATION REQUIRED.—No deduction shall be allowed—
  (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

\* \* \* \* \* \* \*

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel \* \* \* (C) the business purpose of the expense or other item \* \* \*

In the instant case, petitioners have failed to provide the Court with any records of unreimbursed expenditures. In addition, petitioners have failed to produce any evidence, either documentary or testimonial, which would corroborate their own testimony, which was vague and overly general, as to the requirements set forth in section 274(d). See *Hughes v. Commissioner*, 451 F.2d 975 (2d Cir. 1971), affg. a Memorandum Opinion of this Court; *Schwartz v. Commissioner*, 60 T.C. 728, 741 (1973); secs. 1.274–5(c)(3), 1.274–5(e), Income Tax Regs. Even though it is likely that petitioners did incur unreimbursed expenses while away from home, satisfaction of the substantiation requirements is mandatory and an allowance of a deduction based on the principle set forth in *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), is not available to petitioners. See *Sanford v. Commissioner*, 50 T.C. 823 (1968), affd. 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969). Accordingly, petitioners are not entitled to deduct any of the unreimbursed expenses for away-from-home travel as claimed by them.

Petitioners further contend that they are entitled to a deduction in the amount of $25 per day while away from home and are not required to substantiate expenses with regard to this amount. Section 274(h) grants the Secretary the authority to prescribe regulations as he deems necessary to carry out the purpose of secton 274. Section 1.274–5(f) was accordingly prescribed and provides:

The Commissioner may, in his discretion, prescribe rules under which—
  (1) Reimbursement arrangements covering ordinary and necessary expenses of traveling away from home (exclusive of transportation expenses to and from destination),
  (2) Per diem allowances providing for ordinary and necessary expenses of

traveling away from home (exclusive of transportation costs to and from destination), * * *

> * * * will, if in accordance with reasonable business practice, be regarded as equivalent to substantiation by adequate records or other sufficient evidence for purposes of paragraph (c) of this section of the amount of such traveling expenses, and as satisfying, with respect to the amount of such traveling expenses the requirements of an adequate accounting to the employer for purposes of paragraph (e)(4) of this section. * * *

Accordingly, petitioners are relieved from the burden of substantiating expenses amounting to less than $25 per day only if those amounts are paid by petitioners' employers. Sec. 1.274–5(f), Income Tax Regs. Therefore, because the expenses in issue were not paid by the hockey teams, petitioners are required to satisfy the requirements of section 274. This they have not done. Petitioners further contend that because they are uneducated Canadian hockey players they should not be required to satisfy the requirements of section 274. They cite no authority for such propositions nor are we able to locate such authority.

Petitioners further contend that they are entitled to expenses relating to transportation to ice arena facilities in Seattle and New York City, respectively. Such transportation was for the purpose of playing a home game or for a practice session. Having decided that petitioners' "tax homes" in 1971 were their respective team cities, these expenses clearly come under the heading of commuting expenses which are nondeductible personal expenses. Secs. 1.162–2(e), 1.262–1(b)(5), Income Tax Regs.; *Feistman v. Commissioner*, 63 T.C. 129 (1974). Moreover, even if the transportaion involved travel from one business site to another, as petitioners argue, they have failed to establish with any degree of specificity the basis for arriving at the amounts claimed for such deduction. The only evidence petitioners presented was their own testimony which was vague and riddled with speculation.

Petitioners also contend that they are entitled to deduct expenses incurred for travel to and from their residences in Seattle and New York City and local transportion terminals while traveling to opponent team cities. We are compelled to deny this deduction for the same reason we denied petitioners' travel expenses incurred while away from home. This is due to the fact that petitioners presented evidence which was restricted to their own testimony which was vague, general, and highly speculative.

With respect to petitioner Hanna and his travel expenses which relate to training camp in Canada, we refer to our decision of the second issue in the instant case. These expenses clearly related to income which was not effectively connected with the conduct of a trade or business within the United States. Secs. 862, 873.

### E. Statute of Limitations

In their pleadings, petitioners allege that the statutory notices are invalid and that the periods of limitations on assessment of additional tax have expired. In the trial memoranda filed by the parties prior to trial, respondent covered the statute-of-limitations issue but petitioner did not. Counsel for respondent, in his opening statement, stated that petitioners conceded the statute-of-limitations issue and counsel for petitioners neither denied that statement nor did he identify the statute of limitations as an issue. Respondent covered the statute-of-limitations issue in his opening brief. Petitioners did not cover it in their opening brief nor did they respond to the arguments of respondent in their reply brief. Accordingly, we hold that if petitioners have not conceded the statute-of-limitations issue, they have abandoned it.[10]

> *Decisions will be entered for the respondent in docket Nos. 4239–75 and 3485–76.*

---

[10]*Imhoff v. Commissioner*, T.C. Memo. 1979–57, affd. in an unpublished opinion (3d Cir., May 20, 1980); *Cecere v. Commissioner*, T.C. Memo. 1975–371, affd. in an unpublished opinion (3d Cir., Dec. 7, 1976).